[No. 38066.    Department One.    January 6, 1966.]

THE STATE OF WASHINGTON, *Appellant*, v. WILLIE PEELE, *Respondent*, JOHN TAYLOR, *Defendant*.*

*Charles O. Carroll, David W. Soukup,* and *Robert E. Dixon,* for appellant.

*Kempton, Savage & Gossard,* by *James S. Kempton,* for respondent.

HALE, J.—As James LaTorre sat at his desk in the Jolly Fuel Company office looking out the window and talking business with Albert Vena, the strange garb of two men coming down the street caught his eye. They were dressed in black—black trousers, black trench coats, and silk or nylon stockings rolled under the brims of their black hats. He had a feeling that something was going to happen, and

*Reported in 409 P.2d 663.

he was right. The two men bolted through the office door, pulling down stocking masks over their faces, but, before their masks came down and their weapons up, he got another good look at them.

One man lifted a weapon that looked like a sawed-off shotgun from under his trench coat and the other raised a pistol. That is, LaTorre first thought it was a shotgun, but on reflection told the police it was a rifle. The two robbers produced a brown paper bag and ordered LaTorre to empty the cash register of its money and then fled his office with $350. That is how James LaTorre described the events of February 15, 1964, taking place at 1615 South Jackson Street, Seattle, at about 12:30 in the early afternoon at offices of the Jolly Fuel Company.

By information, the prosecuting attorney for King County charged Willie Peele, respondent, and John Taylor, defendant, with robbery, and a jury, on July 25, 1964, returned verdicts of guilty against both defendants. Before imposition of judgment and sentence, Willie Peele, on July 28, 1964, filed a motion for new trial, apparently under the provisions of RCW 10.67.010, setting forth in his motion four of the six grounds enumerated in that statute, but omitting the ground relating to newly discovered evidence, RCW 10.67.010(3).

About one month later, August 25, 1964, defendant John Taylor made an affidavit[1] purporting to exonerate Peele of

---

[1]"John Taylor, being first duly sworn, upon oath deposes and says:

"I was found guilty of Robbery July 25, 1964, in Judge Henry's Court. Since that time this has been on my mind and has caused me long hours of unrest, not because I was found guilty of this crime, but because there was another fellow convicted of this crime.

"Maybe it is too late to do anything about his charge, but I feel better by letting someone know and getting it off my chest. This man, Willie, was accused and he denied that he was guilty of the crime. His boss said he was at work and couldn't have done the crime. Sir, they were both right, Willie Peele did not have anything to do with that robbery. It was I and another fellow, his name is Danny Cooper.

"At the trial or before the trial I should have told all I knew about the robbery, but it was impossible for me to believe they would convict him; therefor if he was found not guilty, they would find me not guilty. I still can't believe that it happened in our courts, that a innocent man

the crime by saying that Willie Peele took no part in the robbery; that Taylor and one Danny Cooper committed the robbery and that the latter disposed of the weapon. A subsequent motion for new trial based solely on Taylor's affidavit was filed and argued by Peele, apparently pursuant to RCW 10.67.010(3), which reads:

> Newly discovered evidence material for the defendant, which he could not have discovered with reasonable diligence, and produced at the trial; . . . .

No corroborating evidence supporting the Taylor affidavit was otherwise supplied or alluded to except that which could be found in the record of trial. Nor are there any issues now before us concerning the timeliness of respondent's motion, these matters having been previously disposed of by this court. The trial court, deeming Taylor's affidavit as showing newly discovered evidence warranting a new trial, issued an order granting the new trial and the state now appeals therefrom.

---

could be found guilty of a crime. Again I say this is a relief to my mind to get it off my chest. For the police record and whoever it may involve this is how we robbed the place.

"We were going to robbed the place on Friday but he could not get a car so we put it off a day. We left from 23rd St. drove down to 20th, went over to King, turned around and parked, walked up King to 18, went over to Jakson, came down the street to the fuel company. Went in and robbed the place, came out, ran over to King St. Went up to 20th and over to Union. We went out Union to the lake and divided the money. Stayed for about an hour on the lake then Cooper dropped me off on 22nd Madison. Cooper had a shot gun. At the hearing it was testified that it was a shot gun, it was, but at the trial they had a rifle. That is one of the two reasons I didn't confess this at the trial. The owner was right when he said it was a nickel plated or shiny shotgun, it was a nickel plated shot gun. I don't know what Cooper did with it.

"My other reason for not confessing at the trial was that I didn't believe that a innocent man could be found guilty in our courts. I'm sorry for the inconvenience I caused everybody.

"Sir, there is no end to the sorrow that I feel for Willie Peele, a innocent man. I don't know what I can do to right the wrong I've caused this man, since I don't know law. But as I said before it is somewhat of a relief to get it off the mind. Sir, I thanks you for your time.

"I have wrote this letter on my own free will and every bit of it is true. [Signed] John Taylor."

Before deciding whether the trial court properly exercised its discretion in granting the new trial on the basis that Taylor's affidavit revealed newly discovered evidence, we should first examine the record to ascertain upon what proof the jury found defendant Peele guilty.

James LaTorre, in addition to identifying Peele as the robber carrying the sawed-off weapon, said that a rifle, admitted as plaintiff's exhibit 1, looked like the weapon carried by Peele. It proved to be a lever action, 30-30 rifle, sawed off at both barrel and stock to give it something of the shape of an elongated pistol. Three weeks later, Mr. LaTorre picked out the two defendants from a line-up of 10 or 12 men at police headquarters without earlier having seen their faces in pictures. He said at the trial that he had seen both men coming down the street and again for a few seconds when they came into his office before they could get their stocking masks down.

Eddie Marche, truck driver for St. Vincent DePaul, and employed by the Jolly Fuel Company at the time of the robbery, testified that, while standing on top of a tank truck around 12:30 or 12:40 the day of the robbery, he saw two men walking down the street, one putting a gun in his belt. He said they ran down Jackson Street and turned at 16th Avenue toward King Street.

Clifford Franzen, an employee of Jolly Fuel Company, said he entered the office to be confronted by two men wearing stocking masks, one holding a pistol and the other a weapon that looked like a sawed-off shotgun.

Joseph Jainga, a dispatcher for a gas company, said that he and his wife were driving west on King Street, approaching its intersection with 16th Avenue at about 12:45, on February 15th, and saw two men in dark raincoats running down the street. He slowed his car, he said, because he thought they might run in front of it. As they ran, the raincoat of one of them came open, and its wearer appeared to be carrying a sawed-off shotgun beneath it. He identified both Taylor and Peele in a police lineup as the two men he had seen and Peele as the man carrying what seemed to be the sawed-off shotgun.

Juana Mary Jainga, riding in the same car, also described the incident of two men running toward their car and of her husband slowing the car and remarking that one man had a gun of some kind. She could identify Taylor specifically in the line-up but as to Peele would not go beyond saying that he merely resembled the other man.

David Devine, a Seattle police officer, testified that at 10:50, the night of February 24, 1964, 9 days after the robbery in this case, he and some other officers were summoned to 348 17th Avenue in Seattle, a residence owned by persons having no connection with the defendants, on a tip that a robbery was there in progress. The officers searched the building. In the bathroom on the second floor of the house, Officer Devine found Willie Peele. In the bathtub of the same room, he found the sawed-off, 30-30 Winchester rifle, received in evidence as exhibit 1, and put his initials on it for identification. Also in the bathtub alongside the rifle, he found a knotted silk or nylon stocking. He said that Taylor was found elsewhere in the building. The sawed-off rifle had a 30-30 bullet in the chamber which proved to be similar to those found by Officer Bruce L. Smith on Peele.

Bruce L. Smith, Seattle police officer, went to 348 17th Avenue on the night of February 24th in response to a radio call that a robbery was in progress. He testified he saw both Taylor and Peele there and searched Peele's person after he had been arrested and taken from the house. He found on Peele five 30-30 caliber bullets which were admitted in evidence as plaintiff's exhibit 4.

Defendant Peele sought to prove an alibi. He called as a witness Ernest Cook, a barber, who had conducted his shop for more than 10 years at Sixth and Jackson. Mr. Cook testified that Peele was in his employ during February, the month of the charged robbery, until his arrest; and that the defendant was working for him on Saturday, February 15, 1964, the day of the robbery, as a barber. He said that Saturdays were very busy days and he usually had lunch brought into the shop. On cross-examination, he said that the Jolly Fuel Company would be about 10 blocks

from the barber shop and that Peele could have been away from the place for 10 minutes or so without being missed.

Defendant Peele called no witnesses other than Mr. Cook, nor did he himself take the witness stand. He later recalled Mr. Cook to the witness stand and on redirect examination Mr. Cook said that he and Peele had discussed a radio account of the Jolly Fuel Company robbery; that a helicopter was being used in pursuit of the robbers; and that he remembered laughingly discussing how surprised the criminals would be to hear that the police were in fresh pursuit by air. No other evidence was presented concerning a police helicopter, Mr. Cook's being the only reference to it in the case.

On cross-examination, he reiterated that Willie Peele worked for him on a percentage basis as a barber, but that he kept no employment or work records whatever concerning Peele's job or any showing of the days and time on the job. The state produced evidence that Peele was arrested on the instant charge April 17, 1964.

Defendant John Taylor took the witness stand in his own behalf. At the outset, he said that he had been convicted of nonsupport in California and second degree burglary in Washington. He said that he had been in jail since February 24th or 25th and had not participated in the Jolly Fuel Company robbery of February 15th. He repeated that he had not been in on the Jolly Fuel Company robbery, but could not recall his whereabouts February 15th around noon, the time it took place, because he had not been accused of this particular crime until his arraignment during the following May. He knew, however, both that he was not with Peele at the time of the offense and had not seen him at all that particular day.

On cross-examination, he said that he had been granted a suspended sentence on the second degree burglary conviction and admitted an additional conviction for escaping from the county jail in California. On the jury's verdict of guilty in the instant case, he was sentenced to imprisonment for a term of 20 years, July 31, 1964. August 25, 1964, he signed the affidavit upon which the new trial was granted

defendant Peele. The following January 8, 1965, Taylor, pursuant to a plea of guilty, was sentenced to life imprisonment for a robbery charged to have been committed by him February 24, 1964.

Thus, in addition to the acknowledged convictions shown in the statement of facts, if called as a witness by Peele on a new trial, Taylor's credibility will be affected by a conviction of robbery in the instant case, another robbery on February 24th, and a change in his sworn testimony as evidenced by his affidavit of August 25, 1964, that Peele is innocent and he, Taylor, and one Danny Cooper were guilty.

The evidence has been summarized to show the strength of the state's evidence of guilt in juxtaposition to the weakness of defendants' proof of innocence. Assuming, arguendo, that Taylor will testify that he is guilty and defendant Peele innocent, as indicated in his affidavit, we cannot say, nor could we uphold the trial court's ruling as a matter of law, that this uncorroborated evidence will probably change the result of the trial.

This court has adhered consistently to the now classic statement on new trials made in *State v. Adams,* 181 Wash. 222, 229, 43 P.2d 1:

> The rule is now settled in this state that, to warrant the granting of a new trial on the ground of newly discovered evidence, it must appear (1) that the evidence is such as *will probably change the result* if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. (Italics ours.)

See *State v. Mesaros,* 62 Wn.2d 579, 384 P.2d 372.

The strong and convincing evidence of guilt concerning Taylor and his codefendant Peele makes it unnecessary, we think, to discuss whether the evidence described in Taylor's affidavit can be said to be newly discovered since the trial; or could have been discovered by the exercise of due diligence; or is merely cumulative or impeaching, for it was not said by the court, nor could it

properly be said, that the evidence was such as *will* probably change the result if a new trial is granted.

The trial court in its formal order granting a new trial said merely that the evidence set forth in the Taylor affidavit, if admitted at a future trial, *may* lead to a different result, thus falling far below the minimal requirement that the claimed evidence *will*, in the court's considered judgment, probably change the result. Nor do we think that, had the wording of the order fulfilled the requirements of the rule, the situation would differ, for it is apparent from the whole record that Taylor's evidence — if presented — will probably not change the result and is so weightless that it appears unlikely to result in an acquittal for Peele.

Taylor testified under oath that he did not participate in the robbery; he now swears that he not only committed the crime, but, in seeking to clear his codefendant, names another, one Danny Cooper, as his confederate, supplying no corroboration of nor clues to any facts which might lead to the discovery of corroborating evidence. Standing alone, his new testimony, when considered in the light of his impaired credibility arising from the four convictions and life sentence and the implication that he committed perjury when testifying as to his innocence at the trial, is entitled to scant weight and would probably not affect the result if a new trial is granted. The jury did not believe him at the trial; it is unlikely to believe him now in view of his added testimonial disabilities.

In *State v. Hyde,* 22 Wash. 551, 569, 61 Pac. 719, where, as here, one of the defendants in a robbery trial, after verdicts of guilty, gave a written statement that his accomplice was not implicated in or present at the robbery, this court, in reviewing the question as to whether the trial court properly denied a new trial, said:

> New trials should not be granted on the uncorroborated statements of an accomplice. *State v. Anderson,* 14 Mont. 551 (37 Pac. 1).

Again, in *State v. Wilson,* 38 Wn.2d 593, 623, 231 P.2d 288, a trial for first degree murder in Clark County result-

ing in the death penalty, evidence of fingerprints on a beer bottle found near the scene where some of the criminal acts had occurred had been admitted. The defendants, Turman and Utah Wilson, testifying to an alibi, said that at about the time the crime was alleged to have occurred they were attending the Playhouse Theatre in Portland, from 9 p.m. to midnight. One Eva Adams, although notifying defendants' counsel before the trial ended that she had seen the two men in the theatre, was not called by defendants as a witness to support their alibi.

After verdict of guilty with death penalty, defendants, in support of their motion for a new trial, filed Eva Adams' affidavit which said that if she were called as a witness she would testify that Turman and Utah Wilson, the defendants, sat next to her in the Playhouse Theatre in Portland, March 19, 1950, from 9 p.m. to midnight. Setting forth several reasons *inter alia* why the new trial ought not be granted on this proffered evidence, we said:

> Finally, from the facts heretofore set forth in this opinion, it is manifest that there is no probability that the testimony of Eva Adams would have changed the result. The fingerprint identification of Utah [Wilson] is the most certain known to the law.

Where, as in the instant case, the state has produced strong and convincing evidence of guilt and the defendant little or no evidence of innocence, a new trial should not be granted on the unsupported, uncorroborated testimony of an accomplice or codefendant, nor upon the offer of any new evidence unless it appears that the newly discovered evidence is of such significance and cogency that it will probably change the result of the trial.

Hardly a case can be supposed but what, by diligent search, some additional evidence will be found that would, if offered on the trial, have been admissible on one theory or another. But to grant a new trial on the showing merely that such evidence could not by reasonable diligence have been discovered before trial would leave the law in a state where there would be virtually no end to the litigation of an issue of fact, for each succeeding trial inevitably leaves

new avenues for investigating the facts anew. The test, therefore, among the others enumerated in *State v. Adams, supra,* that the newly discovered evidence must be the kind that will probably change the result of the trial, is a sensible one and essential to the efficient administration of justice.

The trial court did not, and we cannot, say that the recanted testimony of John Taylor, if presented at a new trial, would probably result in a verdict of not guilty for Willie Peele, and, therefore, we reverse the order granting him a new trial and direct the imposition of judgment and sentence on the verdict of the jury.

ROSELLINI, C. J., HILL, OTT, and HAMILTON, JJ., concur.