[Nos. 21476-4-I; 23324-6-I.   Division One.   August 5, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. JAMES
ELBERT HUTCHESON, *Appellant.*

*Elaine L. Winters* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Barbara B. Linde* and *John E. Bell, Deputies,* for respondent.

AGID, J. — Defendant James Hutcheson appeals his judgment and sentence for aggravated murder in the first degree. He contends that the trial court erred in admitting his accomplice's hearsay "confession" into evidence and in denying his motion for a new trial. We affirm the trial court on both issues.

On August 4, 1987, Matt Nickell was murdered. He had been struck at least 15 times in the head with a heavy blunt instrument. In an amended information, the State charged appellant James Hutcheson and codefendants Diane Bowerman and Diane Peterson with first degree aggravated murder. The alleged aggravating circumstance was that Bowerman had solicited Hutcheson to kill Nickell and had agreed to pay him $5,000 to do so. On August 18, a hearing judge committed Bowerman to Western

State Hospital to determine whether she was competent to stand trial.[1] Hutcheson's and Peterson's cases were subsequently severed for trial. Appellant Hutcheson was tried first and found guilty as charged of aggravated first degree murder. He was sentenced to life in prison without possibility of parole.

Hutcheson testified on his own behalf at trial and admitted killing Nickell. He gave the following version of the events: Bowerman had contacted Peterson, Hutcheson's girl friend, to ask whether Peterson knew anyone who could hurt Bowerman's ex-boyfriend for about $5,000. Peterson put Bowerman in touch with Hutcheson. Although Hutcheson was initially reluctant to help Bowerman, he eventually agreed to assault Nickell for $5,000. Bowerman wanted him to "scar [Nickell's] face so he would have to live with it the rest of his life."

After obtaining information from Bowerman about Nickell's apartment and workplace, Hutcheson watched Nickell for several days. On Tuesday, August 4, Hutcheson entered Nickell's apartment and waited for him to come home. He took some valuables from the apartment and placed them in a bag to make it look as if the apartment had been burglarized. When Nickell arrived home, Hutcheson approached him from behind and struck the back of his head with a "tire tool". A struggle ensued, during which Nickell was able to block some of the blows with his arms and hands.[2] A forceful blow to Nickell's face finally brought him down. As Nickell rolled around on the floor, Hutcheson struck him four additional times to keep him from fighting back. Hutcheson kept striking until Nickell stopped moving. He threw some stereo components around the room and left.

Hutcheson returned to Bowerman's apartment and called her at work at the prearranged time of 3:15 p.m.

---

[1] Based on the hospital's report, the judge found Bowerman competent to stand trial.

[2] Despite Hutcheson's claim that he and Nickell struggled for some time, he sustained only a few bruises on his arms.

He told her what had happened and that he thought he might have killed Nickell. Bowerman told Hutcheson where the remainder of the money was. Hutcheson testified that he just meant to hurt Nickell, "mess him up a little bit". He said he did not intend to kill Nickell.

Bowerman claimed her Fifth Amendment right not to testify at Hutcheson's trial. Before trial, the State moved to admit hearsay statements that Bowerman had allegedly made to a co-worker, Daryl Seaver, on the afternoon of August 4 less than an hour after Nickell was killed. After hearing argument on the motion and balancing the various factors applicable in determining the reliability of hearsay statements, the trial court ruled that the statements were admissible.

Seaver was one of the prosecution's key witnesses. He testified that he had met Bowerman at Kenworth Trucking where they both worked. They had known each other for some time, but did not become friends until sometime in April 1987. At that point they had in common romantic relationships which had recently ended badly. During their frequent conversations, Bowerman confided her feelings of pain over the breakup of her relationship with Nickell and her jealousy of Nickell's new girl friend. She appeared increasingly depressed and told Seaver on several occasions that she wanted to find someone to kill Nickell.

On August 4, 1987, Bowerman walked up to Seaver at work and said, "it's over". Seaver, thinking Bowerman meant that she was over her angry feelings, said, "well, good. Now you can go on with your life, and everything will be okay." Bowerman responded, "I just paid a guy $8,000, and he killed Matt for me." She appeared very serious. She then went on to say that a friend from Chehalis had done it for her. Seaver went back to his work area, thought for a minute, and then went to call a friend of his, Steve Crandall, who had "some friends in homicide". Crandall asked Seaver to see whether he could find out more information about the murder. Seaver then

returned to Bowerman's work station and asked her what had happened. She told Seaver that the person she paid to kill Nickell had sneaked into Nickell's apartment and hit him several times in the head with a tire iron. Seaver testified that no one overheard his private conversations with Bowerman, as she stopped talking when others approached. At one point she appeared fearful and said, as if to herself, "I wonder what I will say to the police if they want to talk to me?"

Seaver then contacted the police, although he was nervous about doing so because "he had been in some trouble with the law before" and felt uncomfortable about turning in his friend. He later gave the police a full report of his conversation with Bowerman. After Seaver relayed his conversation with Bowerman to the police, they arrested her. Deborah Harris, Bowerman's apartment manager and friend, testified that when the police arrived, Bowerman called Harris and asked her to come to Bowerman's apartment stating that, "Matt is dead. . . . I paid to have it done."

Bowerman, also charged with the aggravated first degree murder of Nickell, testified on her own behalf at her trial held several months after Hutcheson's. She testified that Nickell was an alcoholic and would assault her when he was drunk. She described her history of abusive relationships and Nickell's abusive behavior toward her.

In her version of the facts, Bowerman explained that in March 1987, Nickell began seeing another woman. This upset her very much. Bowerman confided her hurt feelings to Seaver, and he talked about how he was upset over ending his relationship with his girl friend. Contrary to Seaver's testimony, however, Bowerman testified that it was Seaver who brought up the idea of hurting Nickell and had told her that he had friends who could do it. She testified that Seaver had asked a "biker" friend to call Bowerman about hurting Nickell. She told Seaver she did not want anyone to hurt Nickell. By midsummer, however, Bowerman had changed her mind and decided

she wanted to hire someone to hurt Nickell. She thought if she hurt him, she could nurse him and he would love her again. In a telephone conversation with her friend Peterson, Bowerman said that she wished Nickell were dead. Peterson then put Hutcheson on the phone and Bowerman told Hutcheson that she wanted him to hurt Nickell. Hutcheson told Bowerman it would cost $8,000 to $10,000, but Bowerman said that was too much.

Bowerman continued, explaining that she later called Hutcheson and asked him to "Do something to Matt for me. . . . Break his leg or something." She told Hutcheson she could pay him only $5,000. Hutcheson agreed to beat up Nickell for that amount. Bowerman testified that she hired Hutcheson to break Nickell's legs so that he would be so helpless that he would need her to nurse him. She claimed that she never asked Hutcheson to kill Nickell. Finally, Bowerman testified that, as she and Hutcheson made plans to hurt Nickell, she kept Seaver fully informed. She denied Seaver's version of their conversation of August 4, 1987.

Bowerman gave the police two different statements the day of her arrest. In her first statement, she told Detective Earl Tripp that she knew nothing about Nickell's murder, but that Nickell's new girl friend might have something to do with it. Bowerman changed her story after Detective Tripp told her he had spoken with Seaver, who had revealed his prior conversation with Bowerman. In her second statement she implicated Hutcheson. She also told Detective Tripp that she had told Peterson that she wished Nickell were dead, and that she intended to kill Nickell. Detective Tripp testified that Bowerman had called her mother in his presence and told her that she had paid to have Nickell killed. At her trial, however, she denied ever having said that she wanted to have Nickell killed.

At Bowerman's trial, the defense presented testimony of Dr. Laura Brown, a clinical psychologist and expert on posttraumatic stress syndrome and, specifically, battered

woman syndrome. Based on her examination of Bowerman, Dr. Brown concluded that Bowerman suffered from battered woman syndrome and a dependent personality disorder. In Dr. Brown's opinion, Bowerman "could not conceive of doing anything that would make [Nickell] absent from her life in any way, alive or dead." Dr. Brown's opinion was that Bowerman wanted Nickell back, and that she therefore did not want him dead. The jury nevertheless convicted Bowerman of aggravated first degree murder.

On February 25, 1988, Hutcheson moved for a new trial based on the "newly discovered" testimony of Bowerman and Dr. Brown. The trial court denied the motion. This appeal followed.

I

BOWERMAN'S CONFESSION TO SEAVER

Hutcheson first contends that the trial court improperly admitted Bowerman's confession to Seaver that she had paid a man to kill Nickell and her description of how the murder took place. He argues that the testimony was improperly admitted under ER 804(b)(3) and that its admission violated the confrontation clause.

A. Admissibility Under ER 804(b)(3)

■ Bowerman's statements, offered through the testimony of Seaver at trial, were clearly out-of-court statements offered in evidence for the truth of the matter asserted and therefore hearsay. *See* ER 801(c). The trial court found those statements to be admissible, however, under ER 804(b)(3), which provides an exception to the hearsay rule for statements which are against the declarant's penal interest when the declarant is unavailable to testify at trial.[3] ER 804(b)(3) defines a "Statement Against Interest" as:

---

[3]Neither party disputes that Bowerman was unavailable to testify. She claimed her Fifth Amendment privilege against self-incrimination and thus could not be subjected to cross examination. *See State v. Parris*, 98 Wn.2d 140, 144, 654 P.2d 77 (1982).

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

It is the declarant's awareness of the criminal nature of the acts described in her statement which renders the statement reliable and thus justifies the hearsay exception. *State v. Parris*, 98 Wn.2d 140, 150, 654 P.2d 77 (1982); 5B K. Tegland, Wash. Prac., *Evidence* § 403, at 266 (3d ed. 1989). The "courts have been willing to assume that a reasonable [person] would be aware of the disserving nature of his [or her] remarks even when they are made to a supposed friend." *Parris*, 98 Wn.2d at 150.

Bowerman's alleged confession and description of how Hutcheson carried out the contract to kill Nickell clearly subjected both of them to criminal liability. Hutcheson argues, however, that because Bowerman was not a "reasonable person" at the time she allegedly made the statements to Seaver and was therefore unaware that her statements could subject her to criminal liability, the statements were not admissible under ER 803(b)(4).

In support of his argument that the faculties of a reasonable person could be not attributed to Bowerman, Hutcheson cites a mental health report prepared in accordance with the court's order that Bowerman be evaluated to determine her competency to stand trial.[4] However, based on the mental health report, Bowerman

---

[4]As appellant's counsel concedes, he is not in the position to argue the report's effect because he has never reviewed it. Although appellant moved several times below to discover the report, those motions were all denied. In deciding whether to admit Bowerman's hearsay statements through Seaver, the trial judge did review the report in camera and determined that it did not affect the admissibility of the statements. We have reviewed the report as well and concur with the trial court that it does nothing to bolster Hutcheson's argument.

was found competent to testify at her own trial. While Bowerman may have been angry and depressed after Nickell broke off their relationship, there is no evidence that she was so mentally impaired that she was unable to perceive the criminal nature of the acts she described in her statements.

Moreover, the record clearly indicates that Bowerman was aware that she could be made criminally responsible for her actions. When first questioned by the police, Bowerman denied having any involvement in the murder. In fact, she initially tried to implicate Nickell's new girl friend because she "was mad at her". In addition, her conversation with Seaver was private, and when people started entering the room where they were talking, Bowerman ended the conversation. A few minutes later when Seaver questioned her about what happened, she wondered aloud what she would say to the police if they wanted to talk to her.[5] There is ample evidence that she was aware that she could be subject to criminal liability for her role in Nickell's murder. Thus, Hutcheson's argument that Bowerman's hearsay statements were improperly admitted under ER 804(b)(3) because she was not aware they were against her penal interest must fail.

### B. Admissibility Under the Confrontation Clause

Hutcheson next argues that the trial court's admission of the hearsay statements also violated the con-

---

[5]At oral argument, defense counsel argued that even if Bowerman were aware that her acts could subject her to criminal liability, she did not realize that she could be charged with a crime as serious as first degree aggravated murder for merely hiring someone to "hurt" Nickell. We reject this argument. Bowerman's awareness of the types of crimes with which she could be charged has no relevance here. In order for a statement to be against the declarant's penal interest, she does not necessarily have to have known she would be charged with the crime with which she is ultimately charged. It is enough that she recognized that her acts or omissions could subject her to criminal prosecution. *See United States v. Hoyos*, 573 F.2d 1111, 1115 (9th Cir. 1978) (a statement against penal interest is one that, "in a real and tangible way, subject[s] [the declarant] to criminal liability").

frontation clause of the Sixth Amendment.[6] The confrontation clause is not absolute, however. *California v. Green*, 399 U.S. 149, 155-56, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970). An unavailable declarant's hearsay statements that are admissible under a hearsay exception are also admissible under the confrontation clause if they bear adequate indicia of reliability. *Ohio v. Roberts*, 448 U.S. 56, 65-66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980); *State v. Ryan*, 103 Wn.2d 165, 175-77, 691 P.2d 197 (1984). While certain hearsay exceptions are considered so "firmly rooted" that they are inherently reliable, the exception for statements against penal interest does not fall within that category. *Parris*, 98 Wn.2d at 148. Thus, we must determine whether Bowerman's statements to Seaver are marked with adequate indicia of reliability.

■ In *Ryan*, the Supreme Court set forth the factors to be considered in determining the reliability of hearsay statements that are admissible under a hearsay exception. The *Ryan* court compiled its list of factors from the courts' analyses in *Parris* and *Dutton v. Evans*, 400 U.S. 74, 88-89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970). Those factors are:

> "(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness." . . . [and the *Dutton* factors]: (1) the statement contains no express assertion about past fact, (2) cross examination could not show the declarant's lack of knowledge, (3) the possibility of the declarant's faulty recollection is remote, and (4) the circumstances surrounding the statement (in that case spontaneous and against interest) are such that there is no reason to suppose the declarant misrepresented defendant's involvement.

103 Wn.2d at 175-76 (quoting *Parris*, 98 Wn.2d at 146). It is not necessary for all the indicia of reliability to be

---

[6]The sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him".

present; rather, the court must be satisfied after weighing the various factors that the balance weighs in favor of reliability. *State v. Anderson*, 107 Wn.2d 745, 753, 733 P.2d 517 (1987).

The trial court in this case applied the *Ryan* factors and determined that Bowerman's hearsay statements were sufficiently reliable to justify their admission into evidence. Hutcheson argues that the balance weighs against the reliability of the statements.

Applying the first factor, Hutcheson concedes that Bowerman had no motive to lie. He contends, however, that Bowerman's general character weighs against finding her statements reliable because she was evaluated to determine her competency to stand trial and she initially lied to the police about her involvement in the killing. We rejected the first ground in part I of this opinion. It is also unpersuasive because Bowerman was in fact found competent to stand trial. That she lied to the police before she learned they knew about her involvement is consistent with the typical behavior of any criminally culpable person who does not want to get caught. When the police told Bowerman they knew she was involved and was lying, she changed her story and admitted hiring Hutcheson to "hurt" Nickell. Moreover, there is no reason to believe that Bowerman would lie to Seaver, her friend and confidant. Finally, as the trial judge pointed out, Bowerman had established herself as a person of good character who had no prior criminal record and had held a responsible job for 11 1/2 years even though she was only 34.

█ Hutcheson claims that only one person, Seaver, heard the statements. While this is true, Bowerman made similar statements to her mother and her apartment manager and friend, Harris. She also told the police that she had told Peterson she wanted Nickell dead. Although only Harris' statement was admitted at trial, the trial judge considered the other statements in considering whether Bowerman's statements were admissible. The other statements corroborate Bowerman's hearsay state-

ments to Seaver and thus weigh in favor of the latter statements' reliability.[7]

■ Hutcheson concedes that Bowerman's initial confession, in which she allegedly stated, "[I]t's over. . . . I just paid a guy $8,000, and he killed Matt for me", was spontaneous. However, he argues that the other statements, made about one-half hour after the initial confession, in which Bowerman described the details of the plan and the killing were not spontaneous because they were made in response to Seaver's questioning. A statement that the declarant volunteers in response to a question that is neither leading nor suggestive is "spontaneous". *State v. McKinney*, 50 Wn. App. 56, 63 n.4, 747 P.2d 1113 (1987), *review denied*, 110 Wn.2d 1016 (1988); *State v. Henderson*, 48 Wn. App. 543, 550, 740 P.2d 329, *review denied*, 109 Wn.2d 1008 (1987). Bowerman volunteered the other information in response to Seaver's open-ended question about what had happened. Thus, those statements were also spontaneous.

The trial judge determined, and Hutcheson apparently concedes, that the timing of the declaration and the relationship between the declarant and the witness clearly support the statements' reliability. As the *Anderson* court found, "[t]he fact that the statements at issue were made to a confidant prior to any police suspicions arising weighs heavily in favor of reliability." 107 Wn.2d at 753.

Turning to the *Dutton* factors, the trial court acknowledged that Bowerman's statements contained some assertions of past fact. However, the events had occurred in the immediate past, less than an hour before Bowerman told Seaver, making it unlikely that Bowerman could have fabricated her story. She could not have

---

[7]Appellant does not assign error to the trial court's consideration of Bowerman's statements not admitted at trial in its hearsay admissibility determination, and we find none. The trial court may properly consider other contemporaneous corroborating statements as part of its review of the surrounding circumstances in evaluating the reliability of hearsay statements. *Parris*, 98 Wn.2d at 152.

known what had happened moments before unless she were involved. Although Bowerman's own testimony at her trial indicates that she might have denied some aspects of her hearsay statements, she admitted having hired Hutcheson to injure Nickell. Thus, cross examination could not have shown her lack of knowledge. Further, because the statement was made so close in time to the actual killing, her memory could not have been faulty. Finally, because the statements were spontaneous and against interest, Bowerman had no motive to misrepresent Hutcheson's involvement.

In summary, although Bowerman's statements contained some assertions of events that had already occurred, those events had occurred so recently that this factor is not particularly significant. Much more compelling are the timing of the statements, made before Bowerman was suspected of any involvement, the trusting relationship shared by Seaver and Bowerman, and the fact that Bowerman had no motive to lie. These factors weigh heavily in favor of reliability. Thus, the trial court's admission of the hearsay statements did not violate Hutcheson's right of confrontation.[8]

Hutcheson claims, however, that the confrontation clause also requires the trial court to consider the credibility of the in-court witness in determining the reliability of the declarant's out-of-court statement. *See United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir. 1978). In that case, the court did hold that when an inculpatory statement is sought to be admitted under ER 804(b)(3), the confrontation clause requires corroborating circum-

---

[8]Defense counsel invites this court to rule that article 1, section 22 of the Washington State Constitution gives greater protections to our citizens than does the confrontation clause of the Sixth Amendment. Article 1, section 22 (amend. 10) gives criminal defendants the right to "meet the witnesses against him face to face". Because our Supreme Court has declined to interpret the state constitutional provision as conferring broader protection that its federal counterpart, we also decline counsel's invitation to make such an interpretation here. *See State v. Palomo*, 113 Wn.2d 789, 794, 783 P.2d 575 (1989), *cert. denied*, 111 S. Ct. 80 (1990).

stances that clearly indicate the statement's trustworthiness. The court found that trustworthiness should be determined by two factors: "the probable veracity of the in-court witness, and the reliability of the out-of-court declarant." 584 F.2d at 701.

However, the credibility of the witness is not a required factor under *Ryan*, *Parris*, or *Dutton*. Moreover, in determining the reliability of a hearsay statement, our courts have focused not on the testifying witness' reliability but on the circumstances surrounding the declarant and his or her statement. Such a focus is proper given that the in-court witness is under oath and subject both to cross examination and to the jury's evaluation of his or her demeanor. *Anderson*, 107 Wn.2d at 751. Here, Hutcheson was entitled to introduce evidence to impeach Seaver's credibility on cross examination. It is for the jury, not the court, to judge Seaver's credibility and weigh the evidence before it.

## II
### MOTION FOR NEW TRIAL

Hutcheson also contends that the trial court erred in denying his motion for a new trial. A criminal defendant may move for a new trial under CrR 7.6(a)(3), which provides:

> The court on motion of a defendant may grant a new trial for any one of the following causes when it affirmatively appears that a substantial right of the defendant was materially affected:
>
> . . . .
>
> (3) Newly discovered evidence material for the defendant, which he could not have discovered with reasonable diligence and produced at the trial[.]

Appellant moved for a new trial on the ground that Bowerman's testimony given at her trial and Dr. Brown's testimony about the battered woman syndrome was "newly discovered evidence". The five factors considered

by a trial court in determining whether to grant a motion for a new trial on that ground are that the evidence:

> (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.

(Italics omitted.) *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981). If any one of these grounds is absent, the trial court may refuse to grant a new trial. 96 Wn.2d at 223.

In deciding a motion for new trial, the trial court is vested with broad discretion. The court's denial of the motion will not be disturbed absent a manifest abuse of discretion. *Williams*, 96 Wn.2d at 221; *State v. Barry*, 25 Wn. App. 751, 757, 611 P.2d 1262 (1980). "Abuse of discretion is discretion exercised on untenable grounds for untenable reasons." *State v. Sanchez*, 60 Wn. App. 687, 696, 806 P.2d 782 (1991).

Bowerman claimed her Fifth Amendment privilege against self-incrimination and refused to testify at Hutcheson's trial. Thus, her testimony and Dr. Brown's psychological evaluation of her was evidence that was discovered after and could not have been discovered before trial by the exercise of due diligence. The evidence was not revealed until Bowerman testified at her own trial months after Hutcheson was convicted.

The evidence was also arguably material. However, the other two factors set forth above are clearly not satisfied here. The most significant factor in this case is whether the newly discovered evidence would probably change the result of the first trial. In deciding this question, the trial court must evaluate the credibility, significance and cogency of the new evidence. *State v. Peele*, 67 Wn.2d 724, 409 P.2d 663 (1966); *Barry*, 25 Wn. App. at 758. Here, the trial judge evaluated Bowerman's trial

testimony and concluded that it contained so many inconsistencies that a jury would be unlikely to find it credible.

As the trial court observed, Bowerman changed her story several times. When initially interviewed by police, she denied having any involvement in Nickell's death and attempted to implicate his new girl friend. Once the police told her they had talked to Seaver and knew she was lying, she admitted she had hired Hutcheson to "hurt" Nickell. At the same time, she admitted she had told Peterson she wanted him killed.

In addition, although Hutcheson claims that Bowerman's testimony is significant because it corroborates his testimony, their stories were inconsistent on a key point. They both contend that their agreement was that Hutcheson would assault Nickell, not kill him. However, Hutcheson testified that Bowerman wanted him to scar Nickell's face so that he would have to suffer the rest of his life. Bowerman, on the other hand, testified that she instructed Hutcheson to break her ex-boyfriend's legs, incapacitating him so that he would need her to nurse him back to health. One story reflects the need for revenge; the other, the desire for love. They cannot be squared.

The Bowerman jury heard her testimony denying Seaver's account of their conversation, suggesting that Seaver encouraged Bowerman to hire someone to hurt Nickell and corroborating appellant's testimony that Bowerman hired appellant to "hurt", not to kill, Nickell. It also heard Dr. Brown's expert testimony that Bowerman suffered from battered woman syndrome and that she could not have intended to have Nickell killed. The Bowerman jury's verdict clearly indicates how little weight it accorded this testimony: it found Bowerman guilty of aggravated first degree murder. That verdict reveals that Bowerman's and Dr. Brown's testimony on

the question of whether Bowerman intended to kill Nickell was not believable. The verdict is another compelling reason to uphold the trial court's decision denying Hutcheson a new trial.

There are other reasons for concluding the Bowerman and Brown testimony would not change the result of Hutcheson's trial. The issue in this case ultimately was Hutcheson's intent, not Bowerman's. At most, evidence of Bowerman's intent goes to what she hired Hutcheson to do, not what he actually did when he entered Nickell's apartment with the tire iron. The most compelling evidence of Hutcheson's intent to kill was the manner in which he in fact killed Nickell. Hutcheson struck Nickell with a tire iron at least 15 times in the head and face, inflicting several of the blows after Nickell was already on the floor. He struck Nickell until he stopped moving. This alone is sufficient evidence to support the jury's verdict that Hutcheson intended to kill, not injure, Nickell.

The strength of the State's evidence also supports the trial court's ruling. In *State v. Peele, supra,* two men were charged with a robbery, tried together and convicted. One of the defendants later came back, claimed that his codefendant was innocent and alleged the involvement of another man. The allegedly innocent codefendant brought a motion for a new trial based on his codefendant's exculpatory affidavit. The trial court granted the motion for new trial and the State appealed. After examining the evidence presented during the first trial, the court concluded that the evidence inculpating the allegedly innocent defendant outweighed the uncorroborated affidavit of his codefendant. In reversing the trial court, the Supreme Court held that when the State's evidence of guilt is strong, the trial court should not grant a new trial based on the uncorroborated testimony of a codefendant or accomplice, unless it appears that the new evidence will

probably change the result of the first trial. *Peele*, 67 Wn.2d at 732.

Similarly, in the present case, the State's evidence showing that Hutcheson intended to kill Nickell substantially outweighed the uncorroborated testimony of Bowerman. Seaver's testimony relaying Bowerman's confession to him was not the only evidence of Hutcheson's intent to kill. Harris testified that Bowerman told her that Nickell was dead and that she paid to have it done. Bowerman made similar statements to her mother and to Peterson. While the latter statements were not admitted into evidence in Hutcheson's trial, they would likely be admitted in a new trial in which Bowerman's testimony would be the crucial new evidence.

Finally, the trial judge also could have denied appellant a new trial on the ground that the only aspect of the new evidence which could have any potential significance to the jury — Bowerman's testimony casting doubt on Seaver's motive — was merely impeaching. A new trial should not be granted when the only purpose of the new evidence is to impeach testimony presented at trial. *State v. Sellers*, 39 Wn. App. 799, 807, 695 P.2d 1014, *review denied*, 103 Wn.2d 1036 (1985). Without corroboration of Bowerman's testimony that Seaver had encouraged her to act criminally, that testimony would only serve to impeach Seaver's credibility in a new trial.

For all of these reasons, we conclude that the trial court properly denied Hutcheson's motion for a new trial. The judgment is affirmed.

SCHOLFIELD and COLEMAN, JJ., concur.

Reconsideration denied September 30, 1991.

Review denied at 118 Wn.2d 1020 (1992).