FILED
COURT OF APPEALS
DIVISION II

2014 APR 29 AM 8: 43

STATE OF WASHINGTON

BY

DEPUTY

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43597-7-II |
| Respondent, | |
| v. | |
| WILLIAM LLOYD CARTER, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — William Lloyd Carter appeals the trial court's decision to deny his motion for a new trial based on newly discovered evidence following his conviction of first degree child molestation. He also argues that he received ineffective assistance of counsel during trial when his attorney moved to suppress exculpatory evidence and failed to call an expert to testify about the concept of transferred memory. Because Carter does not show that his new evidence was material, admissible, and would have changed the trial's result, and because his trial attorney's decisions were based on legitimate trial strategy and the available evidence, we affirm.

### FACTS

In June 2010, Richard called the police to report that Carter had molested 16-year-old GM[1] seven or eight years earlier. Richard is GM's father, and Carter is GM's step-grandfather. The State charged Carter with one count of first degree child molestation (domestic violence).

GM testified that when she was in fifth grade, she lived with her father Richard, her brother, her half-uncle Colin, her grandmother Joy, and her step-grandfather Carter. Her grandparents shared a bedroom on the top floor of the house. GM and her brother shared a room

---

[1] To provide some confidentiality in this case, we use initials in the body of the opinion to identify the minor victim.

on the top floor as well, though her brother usually slept in the basement with their father Richard.

GM testified that she got into her grandparents' bed one night because she was afraid to sleep by herself. When she woke up, her grandmother Joy had gone downstairs, and she could feel Carter's hands on her body. GM was wearing a nightgown and underwear, but Carter put his hands on her bare skin and his mouth on her breast. He touched her chest, back, buttocks and vagina, and under her clothing. She tried to roll away twice, but he rolled her back over and said, "I know that I am a bad grandpa." 1 Report of Proceedings (RP) at 45. Carter stopped and pretended to be asleep when Joy came back upstairs.

Joy told her to go back to her own bed, and GM returned to her room and turned on a movie because she was scared. Carter then appeared at her door and asked if he could watch television with her. She said he could but explained that she had to go to the bathroom first. She went to the bathroom, locked the door, and waited because she could see his shadow under the door.

GM heard the front door open, which meant that her father Richard was home. She called down to Richard and later went to his room to tell him that she was scared because Carter had touched her inappropriately. Richard said he would take care of it, but he did not report the incident.

Both GM and her mother, Jodie, testified that they spent a weekend together in 2010. GM suspected that Jodie was using drugs and became angry with her. Jodie gave GM her drug treatment statement, which explained that she used drugs because she had been sexually abused. GM responded that she had been abused as well but was not using drugs. GM told her mother about Carter. Jodie talked to Richard, and Richard called the police.

Carter, Joy, and Carter's younger son Colin testified for the defense. Joy testified that the family would gather in the bedroom that she and Carter shared to watch television and that she would go downstairs at 3:00 or 4:00 AM to make coffee. Colin testified that he, GM and her brother often fell asleep in his parents' bedroom. Carter testified that he never slept with both his wife Joy and GM and denied molesting GM. The jury found him guilty as charged on December 7, 2011.

On April 6, 2012, Carter moved for dismissal or for a new trial based on an alleged *Brady* violation[2] and newly discovered evidence. This motion was based on an interview that Richard had with a private investigator, Carter's trial attorney, and another defense attorney on March 22, 2012. In that interview, Richard asserted that he had informed the prosecuting attorney before Carter's trial that he had growing doubts about GM's allegations. Richard explained that GM was less certain about Carter's abuse than she was about her previous abuse by Mark Bethea, who was convicted before Carter went to trial. Richard said that he told the prosecutor that GM was confusing her dreams with reality.

The State responded to Carter's motion by filing an affidavit in which the prosecutor denied that the pretrial conversation described in Richard's interview occurred. The State also filed the transcript of a pretrial interview with Richard's mother, Joy, in which she described her son as a compulsive liar.

Richard did not testify at the hearing on Carter's motion despite defense counsel's attempts to secure his attendance. The attorney who prosecuted Carter testified and denied speaking with Richard before trial about any doubts he had concerning GM's allegations.

---

[2] A *Brady* violation occurs when the prosecution suppresses evidence favorable to an accused where the evidence is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Carter's trial attorney testified that she learned during discovery that Bethea had been accused of abusing GM, but saw no reason to pursue this evidence. She moved to exclude the allegations against Bethea because she thought it best to proceed based on the single allegation against Carter. She did not call any expert because she had no reason to do so. She added that Richard was quite hostile to the defense to the point that he was disruptive during Carter's court proceedings and even brought a weapon to the courthouse.

The trial court agreed with the State that there was no *Brady* violation because the evidence showed that the conversation between Richard and the prosecuting attorney did not occur.[3] The court then turned to the motion for a new trial based on newly discovered evidence, observing that its outcome depended on Richard, who had not appeared, and that there was no explanation for Richard's change of heart. The court found that Richard's new statements were "classic impeachment evidence" and denied the motion for a new trial. RP (June 1, 2012) at 96.

On appeal, Carter argues that the trial court abused its discretion in denying his motion for a new trial based on newly discovered evidence and that he received ineffective assistance of counsel at trial.

## ANALYSIS

### A. MOTION FOR A NEW TRIAL

Carter moved for a new trial under CrR 7.5(a)(3), which permits a trial court to grant a new trial based on newly discovered evidence. To grant such a motion, the trial court must find that the evidence (1) will probably change the result of the trial, (2) was discovered since the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is

---

[3] Carter conceded at the outset of the hearing that his claim of a *Brady* violation was "very, very weak." RP (May 25, 2012) at 3. He does not renew this claim of error on appeal.

material, and (5) is not merely cumulative or impeaching. *State v. Macon*, 128 Wn.2d 784, 800, 911 P.2d 1004 (1996). The absence of any one of these factors is grounds to deny a new trial. *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981).

We review the trial court's decision on a motion for a new trial for an abuse of discretion or when the decision is based on an erroneous interpretation of the law. *State v. Robinson*, 79 Wn. App. 386, 396, 902 P.2d 652 (1995). An abuse of discretion exists when the trial court acted on untenable grounds or for untenable reasons. *Robinson*, 79 Wn. App. at 396.

Carter asserts that he could not have discovered this new evidence before trial because Richard was so angry after learning of the allegations of abuse that he could not think clearly, had refused to testify, and that his thoughts cleared only after Carter's trial. The State does not address the timing of Richard's disclosures, and instead focuses on the other elements of the newly discovered evidence test, i.e., whether the evidence would probably change the trial's result, is material, and is not merely impeaching. Because the State does not challenge the timing of the newly discovered evidence, we assume that Richard's disclosures were not discoverable before trial and turn to the remaining elements that Carter must satisfy.

In addressing whether newly discovered evidence would probably change the trial's result, the court must consider the credibility, significance, and cogency of the proffered evidence. *State v. Gassman*, 160 Wn. App. 600, 609, 248 P.3d 155, *review denied*, 172 Wn.2d 1002 (2011). *See also Schlup v. Delo*, 513 U.S. 298, 332, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) (in assessing probative force of newly discovered evidence, "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence"). Evidence is material if it has some logical connection with the facts of consequence or the issues. BLACK'S LAW DICTIONARY 1066 (9th ed. 2009). The

evidence must be material and admissible. *State v. Eder*, 78 Wn. App. 352, 357, 899 P.2d 810 (1995), *review denied*, 129 Wn.2d 1013 (1996). Finally, the newly discovered evidence must not be mere impeachment or evidence offered solely to show the witness is not truthful. *State v. Burke*, 163 Wn.2d 204, 219, 181 P.3d 1 (2008); *see also State v. Hutcheson*, 62 Wn. App. 282, 300, 813 P.2d 1283 (1991) (new trial should not be granted when only purpose of new evidence is to impeach testimony presented at trial), *review denied*, 118 Wn.2d 1020 (1992).

The trial court summarized the key allegations in Richard's interview as follows:

> His doubts arose because [GM] did not appear as confident when talking about [Carter's] abuse as she did when talking about the other sexual abuse she suffered with Mark Bethea. In addition, she would have nightmares about being abused by Mark Bethea but never by the defendant in this case. The victim was a heavy sleeper as a child and had nightmares. Lastly, [Richard] claims that the victim's story would vary slightly when she would tell the story to [Richard].

Clerk's Papers (CP) at 233. We discuss these allegations separately to determine whether they qualify as newly discovered evidence requiring a new trial.

1. DOUBTS ABOUT GM'S ALLEGATIONS

Richard began doubting GM's allegations because her stories about what Carter did "would be fuzzy," and GM's demeanor was different when she talked about what Carter did versus what Bethea did. CP at 140. According to Richard:

> She is my firstborn and she is just like me to the point that I know she is not a liar, she doesn't do this for attention. She—her stories would be fuzzy when it came to *this* detail of what [Carter] did to her. . . .
>     . . . .
>     . . . My daughter is bulletproof, okay, in my eyes, she's my hero because of this. When we would start to talk about Mark [Bethea] the surety, the shoulders up, okay, she knew what happened and she knew that I needed to hear it in explicit detail. Um, she was positive, she didn't um, look off and do these kinds of things, okay. And she knew that the details that she was going to inform me of with Mark were a hundred times worse than the details of the one incident with [Carter], okay.

. . . . And she knew that at the time, my rage for Mark was just as much for [Carter] because these two had violated my daughter, okay. So for me to notice a difference enough to where it would cause me to doubt, is enough proof for me to know that she (sic) not lying, she—you know, I can't reiterate that enough, okay.

CP at 140, 148-49.

The trial court found that this evidence went solely to the victim's credibility and was impeachment evidence. We agree.

While lay opinion testimony may be admissible in some instances, expressions of personal belief as to another witness's veracity are not appropriate. *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). Indeed, the parties agreed before trial that such evidence would be inadmissible. Thus, the trial court did not abuse its discretion in finding Richard's statements went to GM's veracity and were not sufficient to support a new trial.

Comments that are attempts to describe a witness's demeanor may be admissible. *State v. Rafay*, 168 Wn. App. 734, 808, 285 P.3d 83 (2012), *review denied*, 176 Wn.2d 1023, and *cert. denied*, 134 S. Ct. 170 (2013). Here, the only demeanor evidence that Richard described was GM's failure to make eye contact when talking about Carter and her raised shoulders when talking about Bethea. Even if admissible, we do not see these details as material evidence that probably would have changed the trial's outcome, particularly when we consider the trial court's finding regarding Richard's lack of credibility:[4]

He did not show up and testify at the hearing for the new trial and waited until 3 months after the trial to provide this information to defense counsel. His behavior of threatening the defendant with a shiv is not consistent with a person who believed the defendant is innocent as [Richard] claims in his statement. In addition, [Richard's] mother, who was a witness for the defense, does not believe he is a credible witness due to multiple incidents where the defendant has made up false allegations or events. Because [Richard] is not present, there is no

---

[4] We note here that credibility determinations are not subject to review. *State v. Fiser*, 99 Wn. App. 714, 719, 995 P.2d 107, *review denied*, 141 Wn.2d 1023 (2000).

explanation for his change of heart or change of story. [Richard] is the person who brought these allegations to the attention of the police.

CP at 233. Even defense counsel conceded that she had concerns about Richard's credibility during the post-trial interview because of his earlier anger and hostility toward Carter.

The credibility of an affiant is relevant to the probative force of his allegations. Based on the record before us, we see little probability that Richard's testimony about GM's uncertainty regarding Carter's molestation and her demeanor while talking about what Carter did would have changed the trial outcome.

### 2. GM's CONFUSION OF DREAMS WITH REALITY

Richard also thought GM was confusing her dreams with reality because she changed the details of her story and because she is difficult to wake up. Specifically, Richard stated:

> But she could never tell me if it—at first she couldn't even tell me if [Carter] picked her up and she was asleep, okay. I . . . it took quite a few times . . . and then it happened three times, all right.
> But then she was like, no I think maybe those times I was dreamin [sic] . . . then I woke up, but that time I know he did because I woke up and his hand was on my boob. You're eight years old, you don't have a boob, okay but . . . and then you'd—she'd look up into the sky and—and what he said . . . it kind of creeped me out, but it didn't really creep me out. You know, 'cuz it was somethin [sic] that he said, you know, grandma's in the other room, don't worry, baby girl, it's just me and you here, don't be scared. Um, and then it would change to um, you gotta be quiet, grandma's in the other room. Or maybe it was you know . . . those kind . . . those kind of ways that she described.

CP at 149-50.

GM testified that Carter molested her once. Therefore, to the extent Richard's statements claim GM suggested Carter abused her more than once, it would be impeachment evidence. GM's testimony about Carter's alleged abuse did not change. Thus, Richard's statements regarding apparent changes in GM's story when discussing Carter's abuse would, at best, also be

impeachment evidence. Moreover, evidence of how difficult it was to awaken GM is not relevant to any fact of consequence, and it is unlikely that such evidence would have affected the outcome of the trial. Therefore, the trial court did not abuse its discretion in finding these statements failed to provide a basis for a new trial.

### 3. GM'S NIGHTMARES

Finally, Richard asserted that he doubted GM's allegations because she was having nightmares about Bethea, but not about Carter. According to Richard:

> I told [the prosecutor] . . . my daughter needed to get—she needed to get this over with because of the nightmares that she was having—um, about this whole thing—about everything and how often they came and that's why she ended—I made her stop goin [sic] to therapy because when she had to talk about it more, she'd have you know, almost three . . . a week, okay. I mean, scream nightmares and it was always about Mark [Bethea] . . . she'd wake up and she'd have the most scared look on her face, but not once did I ever hear her cry out about Grandpa.

CP at 153-54.

When determining whether newly discovered evidence will probably change the result of trial, we do not consider what effect that evidence may have on the defendant's case, but rather we weigh the newly discovered evidence against the strength of the State's case. *In re Pers. Restraint of Faircloth*, 177 Wn. App. 161, 167-68, 311 P.3d 47 (2013) (citing *State v. Peele*, 67 Wn.2d 724, 732, 409 P.2d 663 (1966)). When there is convincing evidence of guilt and little to no evidence of innocence, the trial court should not grant a new trial "'upon the offer of any new evidence unless it appears that the newly discovered evidence is of such significance and cogency that it will probably change the result of the trial.'" *In re Faircloth*, 177 Wn. App. at 168 (quoting *Peele*, 67 Wn.2d at 732).

Nothing in Richard's statements about GM's nightmares directly undermines the State's evidence. Even if GM's nightmares focused on Bethea, that focus does not show that Carter did not molest GM as well. Thus, Carter has failed to demonstrate that his alleged newly discovered evidence was sufficiently significant and cogent to warrant a new trial. The trial court did not abuse its discretion or erroneously interpret the law in concluding that Richard's post-trial statements did not qualify as newly discovered evidence that justified a new trial.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Carter argues that he received ineffective assistance of counsel at trial because his attorney did not understand that she could have hired an expert to testify about the concept of transferred memory and instead moved to suppress the evidence of GM's abuse by Mark Bethea.

This court reviews ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). In reviewing an ineffective assistance of counsel claim, this court begins with a strong presumption of counsel's effectiveness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) the performance prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness and is not based on a legitimate strategic or tactical decision. *State v. McFarland*, 127 Wn.2d 322, 334-36, 899 P.2d 1251 (1995). We must strongly presume that counsel's conduct constituted sound trial strategy. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 888-89, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700.

Carter complains that his counsel should not have moved to suppress evidence of the allegations against Bethea because that evidence would have helped Carter's case. He explains that counsel could have argued that GM was confused because GM's allegations against Bethea occurred at the same time as her allegations against Carter, and counsel could have hired an expert to discuss the issue of transferred memory, particularly in light of GM's nightmares.

At the hearing on Carter's motion for a new trial, his trial attorney explained that she thought the best strategy was to exclude Bethea's conduct and proceed based on the single allegation against Carter. She added:

> Based on what I anticipated the evidence to be, I thought I couldn't explain away any of Mr. Bethea's conduct or I believe I thought that the jury would make assumptions based on that that I didn't want them to make, so I did ask to exclude his testimony.

RP (May 25, 2014) at 62. Although she was aware of the concept of transferred memory, Carter's attorney had no information at the time about GM's nightmares and no reason to believe that GM was transferring her memory of Bethea's abuse to Carter. GM's testimony regarding Carter's single incident of abuse was clear and consistent, and counsel had no grounds on which to argue the theory of transferred memory without the evidence of her nightmares. Moreover, given Carter's previous argument that this evidence could not have been discovered before trial, counsel cannot now be faulted for failing to rely on it. Carter's trial attorney had legitimate reasons for suppressing the evidence of Bethea's abuse, and Carter does not succeed in showing deficient performance. Consequently, Carter's claim of ineffective assistance of counsel fails.

11

No. 43597-7-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Worswick, C.J.

_____
Johanson, J.