[No. 1810-2.    Division Two.    January 10, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN D. LETELLIER, *Appellant*.

*Christopher J. Bell*, for appellant (appointed counsel for appeal).

*John C. Merkel, Prosecuting Attorney*, for respondent.

HALE, J.*—When Armando Duran walked into the Nelson's Corner Gas Station and told 17-year-old Mark Wilson, on duty there, that he was carrying a shotgun and had four armed confederates outside, Mark believed him and handed over the cash drawer. At least, the young man was disinclined to argue the point, for he had no way of knowing at

---

*Judge Frank Hale is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

the moment that what appeared to be a shotgun would turn out to be a piece of lead pipe and that the four armed confederates would turn out to be defendant John Letellier, unarmed. Nor could one anticipate at the time that defendant John Letellier's claim of a lost wallet and his accusation that Duran had stolen it would figure so largely in later court proceedings. Letellier claimed complete ignorance of the robbery and denied all complicity in it.

Duran's robbery of young Wilson, though completed, proved abortive. He stuffed the money from the cash drawer into his pocket and was about to leave the service station when Louise Jake, who, with her husband, Danny, operated the station, quietly entered, and seeing what was going on, grabbed Duran from behind. As the piece of lead pipe slipped down through Armando's pants, Mark Wilson plucked the money from his pocket. While grappling with Armando, they were able to call Louise's husband and the three took Armando into custody and summoned the Kitsap County Sheriff's deputies.

There was abundant and undisputed evidence that defendant John Letellier, in his red 1966 Pontiac, had driven Armando Duran to the Nelson's Corner Gas Station, parked his car there and later moved it to a concealed location nearby. He owned the lead pipe which Duran had carried into the gas station. Duran said that Letellier put him up to the robbery; told him it would be easy; that only two people would be there; and that there was no way he could get caught. Duran testified that Letellier supplied the lead pipe from under the passenger side of the front seat, and stood by outside ready to make a getaway, while Duran went into the gas station. Two events neither expected: first, that Duran would be captured and second, that Letellier's Pontiac would develop a flat tire at the scene of the robbery. Letellier's wallet was later found near the service station and its return to him figures in the only point raised on appeal.

Convicted by a jury of aiding and abetting in the commission of a robbery, Letellier moved for a new trial

mainly on the ground of newly discovered evidence arising from the location of the wallet when found, and its return to him in jail.

Letellier testified that he had met Armando Duran in the early afternoon of December 19, 1974; they had a few drinks of beer, played some pool, went to Duran's residence nearby where Duran smoked some marijuana and the two then decided to go to Bremerton. It was about 5:30 p.m. when they left Tacoma, and en route to their destination near Bremerton, stopped at Nelson's Corner Gas Station to use the rest room. They then drove on, according to Letellier's testimony, toward Bremerton, and stopped at the house of Letellier's friend. Letellier said he told Duran he had been convicted of two counts of robbery in the Kitsap County Superior Court, but that he did not in any way suggest another robbery, nor have any knowledge that Duran would later undertake one.

It was at his friend's house, he said, following their first stop at Nelson's Corner, that he first noticed his wallet was gone and that they searched for it there. Then, he said, they decided to return to Nelson's Corner to see if he had dropped the wallet on their first stop there. As Letellier described the events in his testimony, he and Duran then backtracked to Nelson's Corner in the hope of locating the spot where he had earlier parked there. It was after 6 p.m. and dark, and Letellier said he got out of the car and began searching. He had no flashlight or other means of illumination, and while he was searching, he testified, Duran, without Letellier's knowledge, procured the lead pipe from under the passenger seat and went into the service station.

Letellier said that he continued searching for his wallet after Duran left the car to go into the service station; and he continued searching until he saw the police cars drive up. He said he waited awhile before making his presence known because one of the terms of his parole required him to stay out of Kitsap County—the judicial district where 2 years earlier he had been convicted of two counts of robbery.

Seeing the police cars, Letellier thought Duran must be in some kind of trouble and he says that he tried to drive away and in doing so saw Duran seated in the back seat of a police car and at about the same time discovered his Pontiac had a flat tire. It was the flat tire, he said, that caused him to drive his car out of the way into the adjacent area that the sheriff's deputies described as a place of concealment. He parked his car, he said, waited a few minutes and then walked over to one of the sheriff's cars and told Deputy Sheriff Peterson that Duran was with him and that he was looking for his wallet. He said he asked the officer if Duran had his wallet. The officer then said to Duran, "Letellier wants to know if you stole his wallet."

Letellier testified that earlier he thought he had seen Duran take a piece of lead pipe from under the passenger's seat, but thought nothing more than that he would use it in searching for the wallet; he denied he saw him take it into the service station and said he was unaware that Duran intended to rob the people in the service station.

It was not the search for, but the return of Letellier's wallet, upon which newly discovered evidence is urged as grounds for a new trial. Greg Harmon, a deputy jailer for Kitsap County, and called as a witness by defendant Letellier, testified that either during the day defendant had been booked (December 19), or the day following "a gentlemen came to the visiting window, stating that he had his wallet, which his wife had found across the street from Nelson's Corner." Attaching no significance to the incident other than as a return of lost property, Deputy Harmon said he wrote a note with the finder's name, address, and phone number, and put the note in the wallet in Letellier's property bag. Letellier, he said, had access to his jail property bag, and after the wallet had been placed there he had gone to get some writing materials. The note with the finder's name, address, and phone number could not, Deputy Harmon said, thereafter be found despite a thorough search for it. The sheriff's office, he said, had made a door-to-door inquiry trying to locate the finder, made use of a reverse

directory to see if any name would, so to speak, ring a bell, and placed an ad in the Port Orchard newspaper requesting the finder to report in to the sheriff's office. There was no response.

After the trial defendant, in support of his motion for a new trial based on newly discovered evidence, filed affidavits of Robert and Patricia Highland, husband and wife. In their affidavits the Highlands said they had found the wallet in a puddle of water at Nelson's Corner to the south of the service station, near the rest room and between 30 to 40 feet from the building. This would place the wallet closer to the service station than across the street from Nelson's Corner where Deputy Harmon had testified the finder had reported finding it.

It is this difference in the stated location of the returned Letellier wallet that forms the basis for defendant's claim of newly discovered evidence. Deputy Harmon testified that the party who brought it in had given his name, address, and phone number, and said the wallet had been found across the street from Nelson's Corner. The Highlands' affidavits said they found it "just off the blacktop to the south of the station near the rest rooms . . . between 30 to 40 feet from the building." They had returned the wallet intact with all of the defendant's money in it.

The Highlands' affidavits also said that in the wallet they found the name of Letellier's parole officer who instructed them to deliver it to the Kitsap County jail. Robert Highland, in his affidavit, said he left a note sketch with the wallet and did not have a conversation with the jailer nor state he had found it across the street from Nelson's Corner.

Motions for a new trial are covered by CrR 7.6, largely a restatement of RCW 10.67.010.

From a substantial body of cumulative law, come well-defined principles declaring that a new trial will not be granted on the ground of newly discovered evidence unless five elements are established:

1. The claimed newly discovered evidence must be such

that it will probably change the result if a new trial is granted.

2. The evidence must have been discovered since the trial.

3. It must be shown that the evidence could not have been discovered before the trial by the exercise of due diligence.

4. The evidence must be material to the issue and admissible.

5. The newly discovered evidence cannot be merely cumulative or impeaching.

*State v. Adams*, 181 Wash. 222, 43 P.2d 1 (1935); *State v. Peele*, 67 Wn.2d 724, 409 P.2d 663 (1966); *State v. Ashby*, 77 Wn.2d 33, 459 P.2d 403 (1969); *Nelson v. Mueller*, 85 Wn.2d 234, 533 P.2d 383 (1975); *State v. Gibson*, 75 Wn.2d 174, 449 P.2d 692 (1969); *State v. Franks*, 74 Wn.2d 413, 445 P.2d 200 (1968). In ruling on a motion for a new trial based on newly discovered evidence, a broad discretion is vested in the trial court which will not be disturbed except for a manifest abuse of that discretion. *Nelson v. Mueller, supra* at 240.

The trial court, we think, stayed within its discretionary power in denying the motion for a new trial.

At trial defendant sought to explain being near the Nelson's Corner Gas Station where the robbery was committed by showing that he had earlier lost his wallet, possibly at that place, and his return to search for it. He presented evidence too, that he had looked for it earlier at a friend's house. He called Deputy Harmon and a jailer, as a defense witness to testify as to its return to the jail.

Deputy Harmon, the jailer, testified that when the finder returned it to the jail, he said it had been found across the street from Nelson's Corner. The finders, in post-verdict affidavits, said it had been found near the rest room between 30 to 40 feet from the building. It is this difference in the reported location of the wallet that forms the basis for the motion for a new trial on a claim of newly discovered evidence.

Except to corroborate other abundant evidence, some of it coming directly from the defendant, that Letellier had driven Duran in his car to the place of the robbery and that he remained outside the service station, either in or in close proximity to his car, while Duran committed the robbery, the location of the wallet, at one place or the other when found, does not appear significant. Defendant presented evidence that the wallet he claimed to have lost had been found near the service station. The State argued that defendant had intentionally dropped his wallet while approaching the police car, across the street from the service station. This argument conformed to the evidence presented by defendant. Wheresoever found, either in the near vicinity of the service station building or across the street or on the service station side of the road, or at some other nearby spot, the same argument could readily have been made with respect to any location of the wallet. It could have been argued in either instance that it had been lost or tossed most anywhere by defendant. Thus, proof of the location of the wallet when found near the service station tended to corroborate defendant's evidence that he had in fact lost his wallet there. Defendant's presence near the scene of the robbery and the finding of his wallet nearby were clearly in evidence and the so-called newly discovered evidence would do little except corroborate both points and would therefore be merely cumulative.

Further, on this particular element it should be noted that defendant called Deputy Harmon to establish that his wallet had been returned and had him give evidence that it had been found across the street from Nelson's Corner. The asserted newly discovered evidence would corroborate this fact except as to the precise spot where found. To the extent of the difference, the evidence as set forth in the Highland affidavit would impeach defendant's own evidence and consequently fail to comply with the fifth element that the newly discovered evidence must not be either merely cumulative or impeaching.

Did the defendant exercise his diligence in trying to find

the identity and address of the party who found the wallet? The search, it is seen from the record, was initiated by the State. Nothing was done by defendant at the outset, although he had the same knowledge of his wallet's return that the prosecution had. It was the prosecution that made house-to-house inquiries, and it was the prosecution which advertised in the Port Orchard Independent newspaper to locate the witnesses. Defendant having made no search whatever for the finder relied upon the testimony of Deputy Harmon. The Highlands who came forward as finders of the wallet did so through defendant's parole officer, who told them where to deliver it. Doing nothing, and relying entirely upon the efforts of the State, fails to meet requirements of the third element requiring the exercise of due diligence.

Would the asserted newly discovered evidence probably change the result if a new trial is granted? The stability of our judicial system to a large degree depends upon the finality of its judgments. When, after thorough investigation of the facts and law, combined with careful preparation of the pleadings and pretrial papers, and thoughtful ruling thereon, evidence is presented to a judge, learned not only in the law, but blessed with a modicum of common sense, and to a lawfully selected jury, a judgment is handed down, that judgment in most instances should ultimately prevail as the final judgment of the court. That is not to say, however, that newly discovered evidence may never induce a new trial, but rather that such proffered evidence shall be scrutinized and tested according to the five elements earlier stated. Rare indeed is the trial in which no new evidence at all, of some kind or other, cannot be claimed to have been discovered. It is for this reason, the likelihood that some new evidence may be discovered or claimed to have been found after trial, that the law supplies a singular test for it by asking whether such evidence would probably change the result if a new trial is granted.

A burden thus falls on the party seeking a new trial based on newly discovered evidence, not only that the

other four elements are met, but to show the court that the newly discovered evidence will probably change the result of the trial. *State v. Peele, supra; State v. Mesaros,* 62 Wn.2d 579, 384 P.2d 372 (1963). Had the wallet been found before trial it could have been offered by the State in its case-in-chief to corroborate proof of defendant's presence near the Nelson's Corner Gas Station during a relevant period of time. Or it could have been offered by the defendant, either on cross-examination or in-chief, in support of the explanation that the defendant was at or near the service station during a relevant time while searching for the wallet. Neither the wallet itself, nor its contents, contained direct evidence, one way or the other, that defendant did or did not participate in the robbery by aiding or abetting. Other than tending to establish defendant's presence there, proof of finding the wallet closer to the service station building and not across the street from it where the deputy jailer said the finder had reported finding it, neither adds to nor detracts from the body of evidence presented. Defendant consequently has failed to sustain the burden of demonstrating that the proffered evidence would probably change the result of the trial. *State v. Gibson, supra; State v. Epton,* 10 Wn. App. 373, 518 P.2d 229 (1974); *State v. Allen,* 72 Wn.2d 38, 431 P.2d 590 (1967); *State v. Bengston,* 159 Wash. 296, 292 P. 1107 (1930). At best it would be merely cumulative, or perhaps impeaching. *State v. Franks, supra; State v. Beeman,* 51 Wash. 557, 99 P. 756 (1909); *Molitor v. Blackwell Motor Co.,* 112 Wash. 279, 191 P. 1103 (1920); *State v. Gay,* 82 Wash. 423, 144 P. 711 (1914).

Only the fourth element, that of materiality and possible admissibility, having been shown and the offered evidence having failed to meet the test of the other four elements requisite to granting a new trial, the trial court did not, we think, abuse its discretion in denying the motion, and accordingly, the judgment is affirmed.

PETRIE, C.J., and PRICE, J. Pro Tem., concur.

Petition for rehearing denied February 10, 1977.