**FILED**
**APRIL 16, 2024**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39076-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CODY JOSEPH KLOEPPER, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Cody Kloepper, convicted of rape in the first degree, burglary in the first degree, and assault in the first degree, appeals the trial court's order denying his request for a new trial.

Mr. Kloepper's conviction rested on overwhelming evidence, including (1) his DNA as the major contributor on a fragment of glove used by the attacker, (2) his physical description matching the attacker's, (3) his afterhours, unauthorized presence at the apartment complex where the attack occurred, at the time the attack occurred, (4) his decision, hours after the attack, to cut his shaggy hair so he would not match the attacker's description, and (5) his access to the victim's apartment key, where evidence suggested the victim's door was locked and the attacker did not force entry. After Mr.

Kloepper's conviction, the Innocence Project obtained evidence of a second man's trace

DNA on both the glove fragment and the victim's clothing. Mr. Kloepper and the second

man had had intimate contact hours before the attack. Because there was only one

attacker, either Mr. Kloepper had brought the second man's DNA to the crime scene, or

the second man had brought Mr. Kloepper's DNA to the crime scene.

There is nothing in the record to suggest the second man could have been the

attacker. The man did not match the victim's description of her attacker as a tall, white

male with shaggy hair. The man is Hispanic with a strong accent. Nothing places the

man anywhere near the victim's apartment on the night of the attack.

In light of the overwhelming inculpatory evidence against Mr. Kloepper and the

exculpatory evidence favoring the second man, we conclude the trial court did not abuse

its discretion when it denied Mr. Kloepper's request for a new trial.

FACTS

*The attack*

At 4:00 a.m. on December 5, 2009, a man attacked D.W. with a metal bar as she

brewed coffee in her apartment at the Villas Apartments in Benton County. D.W. did not

hear any forced entry and habitually kept her doors locked at night. As she struggled

with her attacker, D.W. sustained multiple serious injuries to her head and arms. The

attacker eventually ordered D.W. to the floor, and digitally penetrated her vagina and

2

anus. Before this happened, D.W. heard the attacker applying a latex glove. After the attack, the assailant covered D.W. with a blanket and fled.

D.W. called 911. When the dispatcher asked D.W. to identify her attacker, D.W. replied, "He looked like one of the Villa[s] people. The Villa[s'] maintenance people." Clerk's Papers (CP) at 380 (911 call transcript). D.W. described the assailant as a white male over six feet tall with shaggy brown hair. She said he had been shirtless during the attack. D.W. further stated that the attacker "looked like I hate to say it." CP at 382 (911 call transcript). Instead of completing her statement, D.W. said, "I don't know who he was. I just don't know who he was. I hadn't seen him before." CP at 382 (911 call transcript). D.W. later attributed this reluctance to identify Cody Kloepper as her attacker to her fear of inadvertently accusing an innocent man. D.W. also testified that she was afraid, at that moment, to speak Mr. Kloepper's name aloud.

*Investigation and trial*

Law enforcement initially identified Mr. Kloepper as a person of interest in the attack because Mr. Kloepper, a maintenance worker at the Villas, had been present at work the morning of the attack but then had left without explanation. Interest in Mr. Kloepper as a suspect cooled when D.W. twice identified a separate suspect, Carl Goehring, from a photo array law enforcement showed her. D.W. also identified Mr. Goehring from a lineup. Mr. Kloepper himself appeared in the photo arrays. However,

he did not fit D.W.'s memory of the attacker as Mr. Kloepper in the photograph had cropped hair, rather than shaggy hair.

The State charged Mr. Goehring with the crime. However, when DNA collected from the crime scene matched Mr. Kloepper, the State charged Mr. Kloepper instead. At trial, D.W. identified Mr. Kloepper as her attacker.

The DNA sample matching Mr. Kloepper was collected from a latex glove fragment discovered on the floor in D.W.'s apartment. The fragment had a major DNA contributor and a minor DNA contributor.[1] The major contributor's DNA matched 1 out of every 440 males and was consistent with Mr. Kloepper's DNA. Along with this DNA evidence, the State presented the following evidence against Mr. Kloepper:

- Opportunity. In the hours before the attack, Mr. Kloepper had returned to the Villas after a night of heavy drinking. Planning to sleep in a vacant apartment before working the next morning, Mr. Kloepper accessed the key cabinet in the property manager's office, where a key to D.W.'s apartment also was available. Both D.W.'s testimony and the physical condition of her doorjamb later confirmed the attacker had entered her apartment by key

---

[1] At trial, the DNA technician testified there was a "very, very small amount of this minor component. Actually, so low that [she] really [could not] do much analyses with it, other than saying there was a tiny, tiny amount of DNA from this other contributor." Rep. of Proc. (Aug. 12, 2011) at 582.

rather than using force. Additionally, Mr. Kloepper on prior occasions had completed maintenance requests at D.W.'s apartment. From that experience, the State argued, he would have known D.W. was a small woman living alone. The Villas encompasses nearly 300 units, and D.W.'s apartment was on the fourth floor. To reach D.W.'s apartment, the attacker needed to ascend past multiple other apartments on four landings. All this, the State argued, suggested a targeted attack guided by information Mr. Kloepper possessed.

- Motive. Before driving to the Villas Apartments on the night of the attack, Mr. Kloepper had actively sought out a random sexual encounter. Specifically, he drove 20 miles from his house in Richland to Finley, Washington, where he responded to a personal ad posted on Craigslist by Salvador Contreras.[2] Mr. Kloepper had never met Mr. Contreras before that night. While the men disputed what occurred between them, both agreed that the possibility of sex motivated their encounter. Mr. Contreras testified that Mr. Kloepper left his home in Finley approximately three hours before the attack on D.W. Mr. Contreras further testified that Mr.

---

[2] We take judicial notice that Mr. Kloepper's 2009 house in Richland is approximately 20 miles from Finley, Washington.

Kloepper was sexually frustrated and angry when he left.

- Identification. As mentioned above, D.W. in the moments after the attack, described her attacker as a white male over six feet tall with shaggy brown hair who "looked like one of the Villa[s] people. The Villa[s'] maintenance people." CP at 380 (911 call transcript). Mr. Kloepper fit every aspect of this description. He was a maintenance worker at the Villas. He is a six-foot-four-inch white male with brown hair. At the time of the attack, his hair hung nearly to his shoulders.

- Obfuscation. Soon after the attack, Mr. Kloepper obscured his connection to the crime:

  - Within hours of the attack, Mr. Kloepper left work without notifying his supervisor and shaved his hair short. Mr. Kloepper later told a coworker that he cut his hair because he "looked like that guy that assaulted the girl." Rep. of Proc. (RP) (Aug. 11, 2011) at 467.

  - Within one month of the attack, Mr. Kloepper added additional tattoos to his body.

  - Mr. Kloepper initially lied to law enforcement about his whereabouts and activities on the night of the attack.

6

The jury convicted Mr. Kloepper of all charges. The trial court sentenced him to 25.5 years' confinement and community custody for life.

*Additional DNA testing*

Nine years after Mr. Kloepper's conviction, additional DNA testing detected trace amounts[3] of spermatozoa on two articles of clothing D.W. had worn during the attack. The testing proved conclusively that the spermatozoa belonged neither to Carl Goehring nor to Cody Kloepper, but to Salvador Contreras, with whom Mr. Kloepper had rendezvoused shortly before the attack.[4] Mr. Contreras' DNA also matched the trace minor contributor DNA from the glove fragment found at the crime scene. On the basis of these discoveries, Mr. Kloepper moved for a new trial.

At a hearing pursuant to that motion, Mr. Contreras offered further testimony regarding his own and Mr. Kloepper's activities prior to the attack. By the date of the hearing, 12 years had elapsed since the attack; Mr. Contreras admitted his recollection

---

[3] Sweatpants: stain 2 (5 spermatozoa); stain 3 (0-1 spermatozoa); and stain 8, (1 spermatozoa). Sweatshirt: stain 1 (1 spermatozoa); stain 2 (4 spermatozoa); stain 4 (0-1 spermatozoa); stain 5 (0-1 spermatozoa); and stain 7 (6 spermatozoa). See CP at 607-09.

By contrast, 200 million to 300 million spermatozoa are released in one ejaculation. Zilpah Sheikh, Mary Anne Duncan & Matt McMillen, *What Is Sperm?*, WEBMD (Dec. 23, 2023), https://www.webmd.com/infertility-and-reproduction/sperm-and-semen-faq [https://perma.cc/Z3DN-G9CG].

[4] Mr. Contreras is a convicted felon whose DNA appears in the national Combined DNA Index System (CODIS) database.

was imperfect. Nevertheless, he testified much as he had testified at trial:[5] Mr. Kloepper

had appeared at Mr. Contreras' home in Finley in response to a personal ad Mr. Contreras

had posted online. Mr. Kloepper remained briefly at the home, making sexual overtures

to Mr. Contreras, before departing in anger. The two did not have sex. However, Mr.

Contreras in his new testimony stated that he—Mr. Contreras—likely ejaculated while in

physical contact with Mr. Kloepper. Mr. Contreras testified that he had a history of

premature ejaculation in response only to physical touch, absent sexual intercourse and

even absent an erection. Before testifying, Mr. Contreras had learned from law

enforcement that his sperm had been found at the crime scene.

Citing Mr. Contreras' testimony, the State opposed Mr. Kloepper's motion for a

new trial on the grounds of a transfer DNA theory. Specifically, the State argued that Mr.

Contreras likely deposited his DNA onto Mr. Kloepper during their encounter in Finley,

after which Mr. Kloepper carried that DNA to Richland and deposited it—along with his

---

[5] The principle discrepancy between Mr. Contreras' original and subsequent testimony related to time. At trial, Mr. Contreras estimated Mr. Kloepper had been at his home only 15 to 20 minutes. At the hearing, he testified Mr. Kloepper had remained at his home for 45 to 90 minutes. When pressed about this discrepancy, Mr. Contreras admitted that his recollection at the hearing differed from his recollection at trial. Mr. Contreras at trial also testified that Mr. Kloepper had removed his shirt during the encounter. At the hearing, Mr. Contreras did not remember Mr. Kloepper removing his shirt.

own DNA—at the crime scene. To support this theory, the State cited academic literature verifying the phenomenon of transfer DNA.

The State also emphasized that no circumstantial evidence linked Mr. Contreras to the attack independent of his connection to Mr. Kloepper. Because the original jury already knew unidentified DNA had been found at the crime scene, identifying Mr. Contreras as a contributor—without more—merely put a name to one of the unidentified samples without otherwise changing the facts of the case.

In a memorandum opinion, the trial court denied Mr. Kloepper's motion for a new trial. The court meticulously highlighted the overwhelming evidence against Mr. Kloepper and the paucity of evidence against Mr. Contreras. The court concluded:

> [T]he direct and circumstantial evidence presented at trial was overwhelming against the defendant. The identity of Mr. Contreras's DNA evidence on the tip of the rubber glove fragment as the minor contributor to the DNA profile, and his sperm located on the victim's sweatpants and sweatshirt, would not likely change the result of the verdict, in light of the other overwhelming evidence against Mr. Kloepper.

CP at 856.

Mr. Kloepper timely appeals the trial court's decision.

9

ANALYSIS

*Standard of review*

Mr. Kloepper argues the trial court erred by denying his request for a new trial. This court reviews a trial court's refusal to grant a new trial for abuse of discretion. *State v. Williams*, 96 Wn.2d 215, 221, 634 P.2d 868 (1981). A trial court operates within its discretion when its findings derive from the factual record, its conclusions apply sound law, and its decisions are not manifestly unreasonable. *Clark v. Teng*, 195 Wn. App. 482, 492, 380 P.3d 73 (2016).

*Standard for a new trial*

A trial court may grant a new trial when the movant presents newly discovered material evidence that could not have been discovered and produced at the original trial. CrR 7.8(b)(2); CrR 7.5(a)(3). A defendant obtains a new trial on these grounds only when the evidence, in addition to being newly discovered, material, and admissible, would "probably change the result if a new trial is granted." *State v. Letellier*, 16 Wn. App. 695, 699-700, 558 P.2d 838 (1977). Evidence that is "merely cumulative or impeaching" does not meet this standard. *Id.* at 700.

Mr. Kloepper argues that *Letellier* requires him to show only that the newly discovered evidence would change one juror's mind, resulting in a mistrial, rather than

changing all jurors' minds, resulting in an acquittal.  He produces no cases that support

this "single juror" argument.[6]

The State responds that Mr. Kloepper's "single juror" argument is inconsistent

with *Letellier* and argues that Mr. Kloepper must show that the newly discovered

evidence would probably result in an acquittal, not merely a mistrial.  In support of its

view, the State cites numerous Washington cases.  However, none of the cited cases

clarify the *Letellier* standard, let alone clarify the standard in the State's favor.  The State

also cites cases outside our jurisdiction to support its view.

We observe that Mr. Kloepper's "single juror" argument does not account for the

likelihood that the State would retry the case in the event of a mistrial.  Because of this

likelihood, we discern little if any practical difference in the two standards.

*The new DNA evidence would not probably change the result*[7]

The discovery of another individual's sperm on the clothes of a rape victim, paired

with a lack of the defendant's sperm on the same clothes, would seem to create

---

[6] Mr. Kloepper argues that *State v. Roche*, 114 Wn. App. 424, 59 P.3d 682 (2002), supports this position.  However, the *Roche* court never clarified whether newly discovered evidence, to warrant a new trial, must create reasonable doubt in the mind of one juror or the minds of 12.  Instead, the court concluded only that the newly discovered evidence in that case was so compelling that the defendant should never have stood trial at all.  *Id.* at 440.

[7] The State conceded every *Letellier* element except the probability of new evidence changing the result at trial.

reasonable doubt as to the defendant's guilt. This is especially true given the report submitted by Dr. Charlotte Word, suggesting that transfer deposits of DNA are an unlikely occurrence.

However, in this instance, both Mr. Contreras' DNA and Mr. Kloepper's DNA were discovered at the crime scene. Because D.W. testified that only one person attacked her, we must conclude that a transfer DNA deposit—however unlikely—occurred in this case. Either Mr. Contreras carried Mr. Kloepper's DNA to the crime scene or Mr. Kloepper carried Mr. Contreras' DNA to the crime scene. The unlikelihood of such a transfer makes no difference to our analysis because the unlikelihood applies equally to both scenarios.

The question is who left the other's DNA at the crime scene. More specifically, the question is whether a jury could reasonably doubt that Mr. Kloepper left Mr. Contreras' DNA at the crime scene. The trial court determined this question against Mr. Kloepper. We find no abuse of discretion. Indeed, all of the evidence presented at trial supports the conclusion that Mr. Kloepper left Mr. Contreras' DNA at the crime scene, rather than the other way around.

First, Mr. Kloepper knew the victim, knew where she lived, and knew she lived alone. There is no evidence Mr. Contreras knew the victim or knew anything about her.

12

Second, Mr. Kloepper admitted he was present and drunk at the Villas when the attack occurred. Although he worked at the Villas, the attack occurred around 4:00 in the morning, and Mr. Kloepper had no legitimate reason to be there. By contrast, other than his trace DNA, there is no evidence that Mr. Contreras left his home in the dead of night and drove 20 miles to the Villas.

Third, Mr. Kloepper admitted he accessed the key cabinet soon before the attack, and the key cabinet also contained a key to D.W.'s apartment. Evidence suggests the attacker accessed D.W.'s apartment with a key. By contrast, there is no evidence to suggest Mr. Contreras had access to D.W.'s apartment key.

Fourth, D.W. reported to the 911 dispatcher that her attacker resembled one of the Villas maintenance workers. Mr. Kloepper was a Villas maintenance worker. Moreover, the only Villas employee present at the Villas at the time of the attack was Mr. Kloepper. There is no evidence that Mr. Contreras resembles any Villas employee.

Fifth, D.W. described her attacker as a white male. Mr. Kloepper is a white male, whereas Mr. Contreras is Hispanic. In arguing that the trial court should deny Mr. Kloepper's request for a new trial the State observed, without objection, that Mr. Contreras has "a very strong, noticeable Hispanic accent." RP (Mar. 22, 2022) at 122.

Sixth, D.W. described her attacker as having shaggy hair. Mr. Kloepper at the time of the attack had shaggy hair, and even cut his shaggy hair after the attack because,

as he put it, he "looked like that guy that assaulted the girl." RP (Aug. 11, 2011) at 467.

By contrast, there is no evidence Mr. Contreras ever had shaggy hair.

Because no reasonable jury could disregard all of the inculpatory evidence against

Mr. Kloepper *and* the exculpatory evidence favoring Mr. Contreras, we conclude the trial

court did not abuse its discretion when it denied Mr. Kloepper's motion for a new trial.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:


_____    _____
Fearing, J.                            Cooney, J.

14