IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 85606-5-I |
| ANTONIO INDA, | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

COBURN, J. — Antonio Inda was tried as an adult and convicted of murder in the second degree and unlawful possession of a firearm in the second degree based on events that occurred when he was 15 years old. In his direct appeal, this court declined to consider his claim that the declination process was racially biased because he failed to raise such a claim to the juvenile court.[1] He now raises that claim, as well as others, in this personal restraint petition (PRP). Specifically, Inda contends that (1) the discretionary decline statute is administered in a racially biased manner, (2) the juvenile court did not properly consider the Kent factors in declining jurisdiction, (3) the sentencing court did not properly consider the mitigating qualities of his youth, (3) he was denied effective assistance of counsel at sentencing because counsel, instead of

---

[1] State v. Inda, No. 81069-3-I, slip op. at 3-5 (Wash. Ct. App. Mar. 14, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/810693.pdf. We may cite or discuss unpublished opinions in our opinions if "necessary for a reasoned decision." GR 14.1(c).

obtaining a new report from a mitigation expert, relied on the expert report from the declination hearing, and (5) one of his codefendant's post-conviction declaration is newly discovered evidence that warrants a new trial. Inda has not established a basis for relief. We deny the petition.

## FACTS AND PROCEDURAL HISTORY

> Arturo Alvarez was killed in a drive-by shooting in April 2017, amidst an escalating gang war in south King County. The shots that killed Alvarez were fired from a vehicle driven by Alondra Garcia-Garcia. Fifteen-year-old Antonio Inda, Miguel Bejar Jr., Sergio Contreras, Salvador Estrada-Bautista, and Margarita Alvidrez-Rodriguez were passengers in that vehicle.

> Inda was initially charged in juvenile court with murder in the second degree with a firearm enhancement. The State moved to decline jurisdiction and transfer the case for adult prosecution.

Inda, No. 81069-3-I, slip op. at 1-2.

The court held a three-day decline hearing. At the hearing, Inda's defense counsel presented a report from Dr. Ronald Roesch, a licensed psychologist and psychology professor.

Roesch evaluated Inda to assess whether his case should be transferred to adult court. Roesch interviewed Inda for three and a half hours, had a telephone interview with his mother, and reviewed the State's motion for decline, police records, high school records, juvenile offender status sheets, medical records, police-interviews, detention program modifications, jail calls, photos, and videos. Roesch concluded that Inda is in the high range for risk and protection of the public if he were to be released in the near future. However, he presents a low risk for violent behavior while in custody. Additionally, Roesch stated that Inda's maturity is average for his age because "he is aware of the wrongfulness of his criminal behavior and understands behavioral norms"

but "his judgment and reasoning abilities are underdeveloped" and "[h]e has made poor decisions about his education and his involvement in gang activity."

After the hearing, the juvenile court issued its findings of fact and conclusions of law, ultimately deciding to decline jurisdiction and have Inda's case proceed in adult court. In deciding whether to decline jurisdiction, the court considered each of the eight factors under Kent v. United States, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). Relevant in this petition is the court's consideration of Roesch's report as to the sixth and eighth Kent factors.

The sixth Kent factor addresses the sophistication and maturity of the juvenile after consideration of his home, environmental situation, emotional attitude, and pattern of living. Id. at 567. The court considered Roesch's report, Inda's behavior on the day of the offense, and his school attendance and home life in determining that Inda's sophistication was higher than most 15-year-olds but not more mature than adults in his situation. The court found this factor weighed slightly in favor of decline.

The eighth Kent factor requires consideration of public protection and the likelihood of rehabilitation. Id. The court considered Roesch's recommendation that Inda remain in juvenile court and testimony from corrections employees indicating that, even if Inda was sentenced in adult court, he would receive the same services as those available at the juvenile rehabilitation facility until he turned 21. Additionally, the court cited Roesch's opinion that Inda currently poses a high risk of danger to the community. Therefore, the court found that this factor weighed in favor of decline. After consideration of all eight Kent factors, the juvenile court declined jurisdiction and transferred Inda's case to adult court.

3

In superior court, Inda's case was joined with those of his adult codefendants, Garcia-Garcia and Bejar. Garcia-Garcia was charged with rendering criminal assistance. Bejar and Inda were charged with murder in the second degree.

Eventually, Garcia-Garcia pleaded guilty to an amended information charging her with murder in the second degree with a firearm enhancement. The State also amended the charges against Bejar and Inda, charging each defendant with murder in the first and second degrees, with firearm enhancements, as well as with unlawful possession of a firearm (Bejar in the first degree and Inda in the second).

At [the] trial [of Bejar and Inda as codefendants], the State adduced evidence that Bejar and Inda each fired bullets at Alvarez. Inda testified and denied that he had possessed a firearm or shot at Alvarez.

Inda, No. 81069-3-I, slip op. at 1-2. Bejar did not testify. Additional facts and procedural history are discussed below where relevant. Inda was convicted of murder in the second degree with a firearm enhancement. Bejar was convicted of murder in the first degree. In a bifurcated trial proceeding, Inda and Bejar were each also convicted of unlawful possession of a firearm.

Following conviction in adult court, Inda faced a standard sentencing range of 134 to 234 months for his murder conviction, three to eight months for his weapons conviction, and a 60-month firearm enhancement. The State sought the high end of the standard range which totaled a sentence of 294 months, including Inda's firearm enhancement. Inda requested an exceptional sentence below the standard range of no more than seven years under RCW 9.94A.535(1)(e)[2] and State v. Houston-Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017). In support, Inda relied on the same report from Roesch that was previously submitted at the decline hearing. Counsel explained, "My

---

[2] The court may impose an exceptional sentence below the standard range if it finds that mitigating circumstances are established by a preponderance of the evidence that the "defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired." RCW 9.94A.535(1)(e).

reading of that report, given that it was closer in time to these events, and closer in time to Mr. Inda's age at the time of these events, would be … more representative than the evaluation done now, and that is why I have presented that particular report." Sentencing occurred on January 31, 2020, about three years after the death of Alvarez.

The trial court considered Inda's age, criminal history, gang involvement, dependence on his mother, behavior during detective interviews, participation in the instant offense, and defense counsel's argument for an exceptional sentence below the standard range. The court found the evidence contradictory, supporting findings of immaturity and maturity. Finding that neither a high end nor exceptional downward sentence was warranted, the court imposed a sentence of 134 months plus 60 months for the firearm enhancement for a total of 194 months. This court affirmed his convictions on direct appeal.[3]

Inda now submits this PRP and offers as new evidence a declaration from Bejar. Bejar claims that he was the only person in the van who shot Alvarez. He also claims that Inda did not have a gun at that time because when Inda called Garcia-Garcia for a ride, Bejar overheard Inda say he was "lacking." Bejar understood "lacking" to mean that Inda was unarmed.

DISCUSSION

Standard of Review

PRP relief is extraordinary and is not a substitute for an appeal. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011); In re Pers. Restraint of Hagler, 97 Wn.2d 818, 824, 650 P.2d 1103 (1982). Under RAP 16.4, the court will

---

[3] Inda, No. 81069-3-I, slip op. at 1.

"grant appropriate relief to a petitioner if the petitioner is under a 'restraint' as defined in [RAP 16.4(b)] and the petitioner's restraint is unlawful for one or more of the reasons defined in [RAP 16.4(c)]." Collateral relief is limited because it "undermines the principles of finality of litigation, degrades the prominence of the trial, and sometimes costs society the right to punish admitted offenders." Hagler, 97 Wn.2d at 824.

When collaterally attacking a conviction, we only consider the merits if the petitioner meets their "threshold burden" of showing either a constitutional or nonconstitutional error. In re Pers. Restraint of Davis, 152 Wn.2d 647, 671, 101 P.3d 1 (2004); In re Pers. Restraint of Cook, 114 Wn.2d 802, 814, 792 P.2d 506 (1990). If the error is constitutional, the petitioner must "demonstrate by a preponderance of the evidence that petitioner was actually and substantially prejudiced by the error." Davis, 152 Wn.2d at 671-72. In most cases, this means the petitioner cannot show merely the possibility of prejudice but that the outcome would have been different had the error not occurred. Hagler, 97 Wn.2d at 825. We dismiss the petition if it does not meet this burden. In re Pers. Restraint of Rice, 118 Wn.2d 876, 885, 828 P.2d 1086 (1992).

On the other hand, a nonconstitutional error requires a higher standard above the mere showing of prejudice. Davis, 152 Wn.2d at 672. "We will consider nonconstitutional error only when 'the claimed error constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" Id. at 672 (quoting Cook, 114 Wn.2d at 812).

<u>Washington's Discretionary Decline Statute</u>

Generally, the juvenile court has exclusive jurisdiction over cases where a youth commits a crime. RCW 13.04.030. In limited circumstances, determined by the youth's

6

age and the crime committed, the adult court will have original jurisdiction. RCW 13.04.030. This is known as "automatic decline." See In re Pers. Restraint of Dalluge, 152 Wn.2d 772, 780-81, 100 P.3d 279 (2004). When the juvenile court has jurisdiction, it may have the discretion to decline original jurisdiction and transfer the youth to adult court. RCW 13.40.110. To determine whether discretionary decline is appropriate, the court must hold a decline hearing. RCW 13.40.110. Discretionary decline is only appropriate when the State has proven that decline is "in the best interest of the juvenile or the public." RCW 13.40.110(3). In making this determination, the court considers eight factors, known as the Kent factors, related to the offense and the child. Kent, 383 U.S. at 566-67; see also State v. Williams, 75 Wn.2d 604, 606-07, 453 P.2d 418 (1969) (adopting the Kent factors).

> The Kent factors are:
>
> (1) the seriousness of the alleged offense and whether the protection of the community requires waiver; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the alleged offense was against persons or against property; (4) the prosecutive merit of the complaint; (5) the desirability of trial and disposition of the entire offense in one court when the juvenile's accomplices in the alleged offense are adults; (6) the juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living; (7) the juvenile's record and previous history; and (8) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile by the use of procedures, services, and facilities available in the juvenile court.

State v. M.A., 106 Wn. App. 493, 497-98, 23 P.3d 508 (2001).

### Equal Protection under Article I, Section 12

Inda, who self-identifies as "Hispanic,"[4] contends that the discretionary decline

---

[4] Inda, No. 81069-3-I, slip op. at 3.

7

statute under former RCW 13.40.110 (2009)[5] violates state equal protection under article I, section 12 because it is administered arbitrarily based on race. We review constitutional challenges de novo. City of Seattle v. Evans, 184 Wn.2d 856, 861, 366 P.3d 906 (2015).

The Washington Constitution guarantees equal protection under the law by prohibiting governmental classifications that impermissibly discriminate among similarly situated groups. WASH. CONST. art. I, § 12. Additionally, article I, section 12 "require[s] that persons similarly situated with respect to the legitimate purpose of the law be similarly treated." State v. Shawn P., 122 Wn.2d 553, 560, 859 P.2d 1220 (1993).

The classification determines the standard of review the court applies to a challenged government action. State v. Osman, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). "One of three standards will be applied, depending on the nature of the interest affected or on the characteristics of the class." Shawn P., 122 Wn.2d at 560. Courts apply strict scrutiny, the highest level of scrutiny, if the petitioner is a member of a suspect class or the challenged state action threatens a fundamental right. Osman, 157 Wn.2d at 484; State v. Schaaf, 109 Wn.2d 1, 17, 743 P.3d 240 (1987). "Under the strict scrutiny test, a law may be upheld only if it is shown to be necessary to accomplish a compelling state interest." Schaaf, 109 Wn.2d at 17. Intermediate scrutiny applies "if the individual is a member of a 'semisuspect' class or the state action threatens 'important' rights," which requires that the challenged state action further a substantial interest of the state. Osman, 157 Wn.2d at 484; Schaaf, 109 Wn.2d at 17. Courts apply rational

---

[5] Inda clarified in his reply brief that he only challenges the version of the statute in effect in January 2018. Thus, we need not address that State's argument that Inda lacks standing to challenge the current statute.

basis, the lowest level of scrutiny, where the state action does not threaten a fundamental or important right or the individual is not a member of a suspect or semisuspect class. Osman, 157 Wn.2d at 484; Shawn P., 122 Wn.2d at 560.

Inda relies on two reports to assert that Washington's discretionary decline procedure is administered in a racially biased manner. The first is a report by Dr. Heather Evans and Dr. Steven Herbert titled Juveniles Sentenced as Adults in Washington State, 2009-2019 (June 2021) (hereinafter referred to as "Evans Report I") https://www.courts.wa.gov/subsite/mjc/docs/2024/2.5%20Juvenile%20Sentenced%20as %20Adults-2021_AOCreport.pdf [https://perma.cc/LN87-4WN8].

This court previously considered and rejected the same argument and reliance on Evans Report I in State v. Quijas, No. 86360-6-I, slip op. 7-9 (Wash. Ct. App. Aug. 25, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/863606.pdf. We note that Quijas came out after the parties filed briefs and the State referenced Quijas in a statement of additional authorities. Though the claim made in Quijas was a violation of due process and not equal protection, we conclude that consideration of the insufficiency of Evans Report I to support Inda's claim remains.

While Evans Report I does show racial disproportionality in the discretionary decline system, it does not provide an explanation for what mechanisms produce the disparate outcomes. Additionally, the sample size is comparably small, and the report fails to consider relevant factors that may affect the data.

First, the overall sample size for Evans Report I is relatively small.[6] The data includes information on 24,689 unique children under the age of 18 charged with a

---

[6] We recognize each number represents a child and, while the numbers may be statistically insignificant, the children are not.

crime from July 26, 2009, to June 30, 2019. From that group, only 1.2 percent (249 individuals) were discretionarily declined to adult court.[7] This means all data in Evans Report I concerning racial disproportionality in discretionary decline is based on 1.2 percent of the total population of youth charged with a crime. Among the total population of criminally charged youth, decline is rare for eligible children of every race.

Despite discretionary decline being comparatively rare among convicted youth, the State does admit Evans Report I shows that children of color were more likely to be tried as adults during the time studied. But the report does not opine as to why this discrepancy occurs. Inda contends that Evans Report I controlled for criminal history and offense type, and these variables do not explain the patterns; therefore, race must be a determinative factor. As this court observed in Quijas,

> The Evans Report controlled for criminal history by calculating the mean number of prior convictions, but criminal history is more complex than simply counting convictions. The report also controlled for type of offense but, again, even within the categories Evans assigns, there is variance. For example, one category of "type of offense" was "felony homicide." But there are multiple ways to commit felony homicide and they vary greatly in the seriousness of the offense (e.g., premeditated intent versus negligence).

Quijas, No. 86360-6-I, slip op. at 8.

Additionally, Evans Report I did not consider socioeconomic indicators and other familial risk factors as variables impacting discretionary decline even though the court is required to consider them under Kent factor six. M.A., 106 Wn. App. at 497-98 (discussing "the juvenile's sophistication and maturity as determined by consideration of his or her home, environmental situation, emotional attitude, and pattern of living"

---

[7] Of the 24,689 individuals, 97 percent were sentenced as juveniles and two percent (495 juveniles) were transferred to adult court through "auto decline."

(emphasis added)).

Like the appellant in Quijas, Inda compares Evans Report I to the Beckett Report in State v. Gregory, 192 Wn.2d 1, 12-13, 427 P.3d 621 (2018). In Gregory, our state Supreme Court struck down the death penalty as unconstitutional because it was imposed in an arbitrary and racially biased manner. Id. at 35. The court relied heavily on the Beckett Report. Id. at 19. The Beckett Report concluded, "[B]lack defendants were four and a half times more likely to be sentenced to death than similarly situated white defendants." Id. at 12. Unlike Evans Report I, the Beckett Report analyzed each case and coded for numerous variables. Id. at 19.[8] Additionally, the data only analyzed defendants who had committed the same offense—aggravated murder. Id. at 12. As this court concluded in Quijas, "[t]he Beckett Report's rigorous methodology and comprehensive analysis differentiates it from the Evans Report [I]." No. 86360-6-1, slip op. at 9. Accordingly, Evans Report I does not support Inda's assertion that discretionary decline proceedings under former RCW 13.40.110 were administered in a racially biased manner.[9]

Inda also cites to a second report by Evans and Dr. Emily Knaphus-Soran titled The Persistence of Racial Disparities in Juvenile Decline in Washington State, 2009-

---

[8] "The Beckett Report coded each case as to whether the defendant had victimized multiple people as opposed to just one; whether the defendant had caused the victim(s) prolonged suffering; how many aggravating circumstances the State had determined existed; how many aggravators the jury had found existed; the demographics of the defendants' victims; whether the defendant had pleaded guilty; and whether the case had garnered significant publicity." Quijas, No. 86360-6-I, slip op. at 9 n.8.

[9] Inda also cites a supplemental report to Evans Report I specific to King County. As we conclude that Evans Report I is not evidence of racial bias in administering discretionary decline, neither does this supplemental report. Moreover, Inda admits that "the King County data sample was not large enough to disaggregate between automatic and discretionary decline and is not relied upon to demonstrate racial disproportionality here."

2022 (hereinafter referred to as "Evans Report II") (Apr. 2024)

https://www.courts.wa.gov/subsite/mjc/docs/2024/2.4%20The%20Persistence%20of%2

0Juvenile%20Declines%20in%20Washington%20State_4_9_2024.pdf

[https://perma.cc/6LS2-F2SL]. Evans Report II discusses the persistence of racial

disparities in juvenile decline in Washington between 2009 and 2022. The current

version of RCW 13.40.110, which took effect after Inda's decline hearing, amended the

statute to significantly limit the offenses subject to discretionary decline to adult court.

Laws of 2018, ch. 162, § 4. In Evans Report II, researchers not only considered a larger

time frame, but they also conducted a multivariate regression analysis, which looked at

disparities across types of decline, auto, mandatory, and discretionary, both before and

after the 2018 legislative amendments. Evans Report II states that it,

> provides a comprehensive overview of racial disparities in juvenile declines … in Washington State from July 2009 to June 2022. Over the entire period under investigation, 1% of cases involving White youth were declined, 3% of cases involving Latino youth were declined, and 4% of cases involving Black youth were declined. Findings from statistical analysis of juvenile adjudications and convictions of youth in adult court reveal that racial disparities in juvenile decline exist both before and after legislative changes to decline eligibility that reduced the overall number of juvenile declines.

It appears the discussion around Evans Report II grew from the State not realizing that

Inda was not challenging the current version of the statute at the time the State filed its

response brief. After the State argued that the overall number of juveniles declined to

adult court has decreased following the 2018 amendment, Inda cited to Evans Report II

in his reply brief to argue that racial disparities persist even after the 2018 amendment.

Inda does not otherwise reply to the State's argument that this court in Quijas has

already determined that Evans Report I is not sufficient evidence to support his claim.

Moreover, Evans Report II acknowledges its limitations. For example, it notes that "[o]ur data do not specify which cases involved a firearm (as opposed to another deadly weapon) or which were attempts versus completed crimes. This impacts the precision of our classification of cases eligible for automatic decline." Researchers also observe that they are "unable to examine whether there are racialized patterns in amendments made through the plea process" and that "[t]he small number of cases subject to decline in the period following the 2018 legislation renders our estimates relatively imprecise, resulting in larger credible intervals in our multivariate analyses." Lastly, Evans Report II explains that its results from its regression analysis "are suggestive rather than conclusive because they do not take into account the impact of multiple case characteristics simultaneously that are likely to influence prosecutorial and judicial decision-making." Evans Report II does not remedy the deficiencies of Evans Report I.

Because Inda has not presented evidence to support his premise, we need not address his argument that equal protection should be interpreted to provide heightened protection in the context of children in adult court under State v. Gunwall, 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986), which discusses the six factors to be considered in determining whether our state constitution provides broader protection to its citizens than the U.S. Constitution.[10] Our state Supreme Court has also held that the equal protection clauses of the Fourteenth Amendment and article I, section 12 of the Washington Constitution "are substantially identical and subject to the same analysis."

---

[10] The six factors include (1) the textual language of the Washington Constitution; (2) differences between the Washington and federal constitutions; (3) constitutional history; (4) preexisting state law; (5) structural differences between the two constitutions; and (6) matters of state or local concern. Id.

<u>Osman</u>, 157 Wn.2d at 483 n.11. Inda maintains that when children are declined to adult court because the process is administered on a racial basis this court must apply strict scrutiny under our state constitution. Because Inda has not established his underlying premise, we need not address this argument.

<u>Inda's Decline Hearing</u>

Inda also contends that the decline hearing and decision violated his state due process rights. Inda specifically maintains that the court did not properly consider Roesch's evaluation of him when considering the sixth and eighth <u>Kent</u> factors and the court's consideration of the <u>Kent</u> factors was uninformed by juvenile brain science, adultification bias, and implicit racial bias.

A juvenile court's decision to decline jurisdiction is discretionary and is subject to reversal only when it is manifestly unreasonable or based on clearly untenable grounds. <u>M.A.</u>, 106 Wn. App. at 498. The court's factual findings will not be reversed if they are supported by substantial evidence. <u>Id.</u> Substantial evidence is evidence that is sufficient to persuade a fair-minded, rational person of the truth of the premise. <u>State v. Ware</u>, 111 Wn. App. 738, 742, 46 P.2d 280 (2002).

Not all eight of the <u>Kent</u> factors must be proven to justify decline. <u>M.A.</u> 106 Wn. App. at 498. However, the juvenile court abuses its discretion when it fails to give appropriate consideration to the <u>Kent</u> factors. <u>Id.</u> "This court examines the entire record, including the court's oral opinion, to determine the sufficiency of the court's reasons for declination." <u>State v. H.O.</u>, 119 Wn. App. 549, 556, 81 P.3d 883 (2003).

Inda maintains that the court did not properly consider the sixth <u>Kent</u> factor because it disregarded Roesch's findings regarding Inda's brain development and

diminished capacity, family and environmental situation, and "pattern of living."

When discussing the sixth <u>Kent</u> factor, the court considered Roesch's conclusion that Inda's sophistication-maturity score was in the 55th percentile, placing him in the middle range. However, the court was not persuaded by Roesch's evaluation to conclude that factor six weighed against decline. In finding that this factor weighed slightly in favor of decline, the court considered a declaration from Truancy Officer Veronique Chevallier-Gruschow, stating that Inda's mother had little-to-no control over him. Additionally, the court relied on Inda's truancy records which stated that he had not been consistently attending school or court-imposed truancy. Moreover, the court noted that Inda's involvement in the offense showed a level of sophistication. The court also considered Inda's demeanor during his interview with police detectives, however, it indicated the dangers of inferring too much from one 12-minute video. Therefore, the juvenile court found that factor six weighed slightly in favor of decline.

We hold that there was no abuse of discretion and substantial evidence supports the juvenile court's finding that factor six weighed slightly in favor of decline. Contrary to Inda's assertion that the court completely disregarded Roesch's explanation, he admits that the court mentioned Roesch's determination of his maturity and cited it to discuss his behavior with his mother, and drugs and gang involvement. Inda also claims that Roesch said that his school attendance, drug use, gang affiliation, interactions with law enforcement, and participation in the instant offense showed immaturity and lack of sophistication. Roesch's report makes no such finding, rather, it indicates that Inda has made poor decisions about his education and involvement with gang activity, but he is aware of the wrongfulness of his criminal behavior and understands behavioral norms.

Therefore, Roesch found Inda's maturity and sophistication to be average.

To the extent that Inda argues that the court did not consider his familial circumstances, we disagree because the court specifically discussed his relationship with his mom, whom he lived with at the time of the offense. Additionally, Roesch's report discussed Inda's relationship with both parents.

Inda also avers that the juvenile court did not adequately consider Kent factor eight because Roesch recommended that Inda remain in juvenile court. In discussing factor eight, the court considered Roesch's recommendation but indicated that three individuals testified to the fact that Inda would receive the same services available to him in juvenile court until he turns 21 years old. The juvenile court highlighted that the only juvenile service Inda may fail to receive if he is sentenced as an adult is temporary release but if sentenced as an adult, he will be able to receive post-commitment supervision that he would not receive as a juvenile. Finally, the court discussed the wide discretion in sentencing that the trial judge would have if Inda was sentenced as an adult. Specifically, the trial court would not be bound by any sentencing range and would be required to consider Inda's youth when sentencing him. Moreover, the court noted that if the sentencing judge in adult court believes that Inda would benefit from a sentence of less than six years, Inda may spend his entire sentence in a juvenile institution.

Inda takes issue with the testimony of Debbie Lyne, deputy director for institution programs for juvenile rehabilitation; Sarah Sytsma, education services administrator at Department of Corrections; and Arlene Scott, classification counsel for the Youth Offender Program at Department of Corrections, because they did not know him

16

personally. But these individuals simply testified to what programs and services were offered to juveniles convicted in adult court. Additionally, Inda argues that the trial court did not account for Roesch's research that juveniles that remain in juvenile courts have lower recidivism risk. To the extent that Inda argues that the court abused its discretion in disagreeing with Roesch's report because it was the only expert testimony, he is incorrect. See, e.g., Brewer v. Copeland, 86 Wn.2d 58, 74, 542 P.2d 445 (1975) ("A trial court has the right to reject expert testimony in whole or in part in accordance with its views as to the persuasive character of that evidence."). We conclude that the court did not abuse its discretion in finding factor eight weighs in favor of decline and is supported by substantial evidence.

Next, Inda alleges that the court's consideration of the Kent factors was uninformed by juvenile brain science. However, the court's consideration of the Kent factors was not uninformed by juvenile brain science. The court considered each Kent factor, Roesch's report, and all other evidence before it. Specifically, Roesch testified at the decline hearing that the impulse centers of the juvenile brain develop long before decision-making but, eventually, the brain continues to develop impulse control and decision-making. Roesch also explained that this development change in the brain is why juveniles should be reassessed to determine whether they still present a risk for future dangerousness because it is expected that the juvenile will change.

Inda also argues that his decline decision was based on adultification bias. Our state Supreme Court has recognized adultification bias as "a cognitive bias in which youth of color are perceived as more mature, and punished more harshly for the same conduct, than their white counterparts." State v. Luna, 5 Wn.3d 465, 520, 578 P.3d 273

17

(2025) (citing In re Pers. Restraint of Miller, 21 Wn. App. 2d 257, 265, 505 P.3d 585 (2022)). In Luna, our state Supreme Court referenced adultification bias to hold that the admission of social media evidence and an interrogation video was not harmless. 5 Wn.3d at 520. The court reasoned that the introduction of this evidence was not harmless because the lower court focused on actions the defendant could have taken to prevent the offense that took place, which was not relevant to her self-defense claim. Id. at 517-18. Additionally, the court indicated that the State relied heavily on the social media evidence, describing it as the "most shocking[]" of the character evidence introduced and no other evidence indicated that the defendant fixated on inflicting violence. Id. at 518. Finally, the court discussed that the State relied heavily on the defendant's demeanor during her interrogation, describing it as "flippant" and "carefree." Id. at 519. The Supreme Court relied on the intersection of youth, gender, and race, as well as adultification bias to hold that the admission of social media evidence and the interrogation video was not harmless. Id. at 519-20.

The instant case is distinguishable from Luna. First, the discussion of adultification bias in Luna occurred during a jury trial and, in the instant case, Inda alleges that there was adultification bias during his decline hearing. Significantly, the court in Luna was concerned with the effect the admitted evidence would have on the jury. Id. at 520. However, at the decline hearing in the instant case, the evidence was before a judge and was to be evaluated within the specific confines of the Kent factors. Additionally, the evidence admitted in the instant case was particularly relevant to the Kent factors, including Roesch's report and Inda's school and truancy records. Moreover, the juvenile court even noted its concerns with heavily relying on one 12-

18

minute interview Inda had with police detectives. The juvenile court's decline decision was not improperly based on adultification bias.

Overall, the record establishes that the court considered Roesch's report but disagreed with his recommendation that Inda should remain in juvenile court. Inda's challenge amounts to asking this court to reweigh the evidence as opposed to establishing that the court abused its discretion.

<u>Mitigating Qualities of Youth under Houston-Sconiers</u>

Inda next argues that the sentencing court did not meaningfully consider the mitigating qualities of his youth. He contends that the sentencing court did not consider every factor under Houston-Sconiers, or the available mitigating evidence.

At sentencing, defense counsel, relying on the same evaluation from Roesch used at the decline hearing, submitted a trial brief arguing that Inda should be given an exceptional sentence below the standard range based on his mitigating qualities of youth. Counsel specifically argued that Inda's choices to join a gang, not attend school, sell drugs, and make threats on Facebook were signs of immaturity and the inability to appreciate risks. Additionally, counsel explained that Inda's mother mostly raised him, he had a troubled relationship with his abusive father, and he lived in a neighborhood known for gang activity. Moreover, counsel reminded the court that it was disputed at trial whether Inda had a gun at the time of the offense, and the jury did not convict him of murder in the first degree. Finally, counsel discussed Inda's susceptibility to peer pressure based on his gang involvement, his immaturity while police interviewed him, and his ability to be rehabilitated based on Roesch's conclusion that he is in the middle range for amenability to treatment.

In Houston-Sconiers, our state Supreme Court held that courts must consider the mitigating qualities of youth when sentencing juvenile offenders in adult court. 188 Wn.2d at 23. Accordingly, in these cases, courts have discretion to impose sentences below the standard range and depart from otherwise mandatory sentencing enhancements. Id. at 34. When considering the mitigating qualities of youth, courts must consider "the juvenile's immaturity, impetuosity, and failure to appreciate risks and consequences; the nature of the juvenile's surrounding environment and family circumstances; the extent of the juvenile's participation in the crime; and the way familial and peer pressure may have affected the youth." Order, State v. Vazquez, No. 97964-2, at 1-2 (Wash. June 5, 2020) (citing Houston-Sconiers, 188 Wn.2d at 23). Moreover, the sentencing court must consider whether youth affected any legal defense or whether the juvenile may be successfully rehabilitated. Houston-Sconiers, 188 Wn.2d at 23. "In addition to the mitigating qualities of youth, sentencing courts must also consider the facts of the particular case." State v. Carter, 3 Wn.3d 198, 212, 548 P.3d 935 (2024). Youth is not a per se mitigating factor; instead, a juvenile must show that their immaturity, impetuosity or failure to appreciate the risks and consequences contributed to the commission of their crime. State v. Anderson, 200 Wn.2d 266, 285, 516 P.3d 1213 (2022). We review the court's sentencing decision for abuse of discretion. Carter, 3 Wn.3d at 212.

Inda alleges a procedural rather than a substantive error. Failing to adequately consider the mitigating qualities of youth is a procedural Houston-Sconiers error. In re Pers. Restraint of Forcha-Williams, 200 Wn.2d 581, 599, 520 P.3d 939 (2022).[11] A

---

[11] A substantive Houston-Sconiers error occurs when the sentence is disproportionate in violation of the Eighth Amendment and article I, section 14. Id. at 594.

Houston-Sconiers procedural error by itself does not constitute per se prejudice on collateral review. Id. at 585. Therefore, the petitioner must show actual and substantial prejudice. Id. at 599 (citing Davis, 152 Wn.2d at 671-72). In determining whether a Houston-Sconiers error is prejudicial, the court can consider numerous factors, including "whether the judge was presented with and considered the mitigating qualities of the offender's youth; whether the judge understood their discretion, where the imposed sentence falls within the standard range; and whether the judge articulated that they would have imposed a lower sentence if they could." Forcha-Williams, 200 Wn.2d at 604.

In Forcha-Williams, our state Supreme Court determined that the court was sufficiently presented with and considered the mitigating qualities of the defendant's youth. Id. Specifically, the court stated that defense counsel, a juvenile probation officer, and a case management mentor argued that the defendant's youth mitigated his culpability and he was capable of rehabilitation. Id. Additionally, there was a presentencing report that contained information on the defendant's family and home environment, school history, disciplinary record, and criminal history. Id.

At the sentencing hearing in Forcha-Williams, the trial court referenced the defendant's youth several times. Id. Additionally, while the court was presented with and considered potential mitigating qualities of youth, the record did not indicate the court thought the defendant's youth was sufficiently mitigating to warrant a lesser sentence. Id. at 605. Notably, the Supreme Court stated that "[w]hile [the] Judge [in Forcha-Williams] could have given a more detailed explanation as to how she accounted for [the defendant's] age, ample evidence in the record shows that youth was presented

21

and considered." Id. Finally, our state Supreme Court stated that the sentencing court's decision to issue a midrange sentence indicates that the trial court did not find the defendant's youth to be a mitigating factor requiring a lesser sentence. Id. Therefore, the court held that the sentencing court sufficiently considered the mitigating qualities of youth. Id. at 606.

The instant case is similar to Forcha-Williams. At sentencing, defense counsel argued that Inda should receive a sentence below the standard range based on the mitigating qualities of his youth. Counsel referenced Roesch's evaluation of Inda as evidence of his immaturity and rehabilitation. The court recognized counsel's arguments in its sentencing decision, stating to Inda, "I accept your attorney's representation that you feel very bad" but "[i]t's hard to tell exactly how you feel about what you did. It could be commitment to the gang culture" or "[i]t could be your immaturity that led you to commit this crime." Defense counsel's sentencing memo also discussed Inda's surrounding environment, family circumstances, participation in the crime, peer pressure, and how youth affected his legal defense. The court also discussed Inda's participation in the crime and peer pressure. The court recognized Inda's gang membership and peer pressure overall and that peer pressure cannot minimize Garcia-Garcia's influence on him and his actions. At the same time, the court specifically found Inda to have "willingly participated" in the event because he was "agitating for violence on Facebook" and was not "peer pressured on the day of this crime." Additionally, the court discussed that, in Inda's video with detectives, he was "very cautious and careful in providing them with any information. Probably much more so than Mr. Bejar was." Roesch's report also discussed Inda's school and criminal history.

As in Forcha-Williams, the sentencing court in the instant case referenced Inda's youth several times but did not indicate that it warranted a sentence below the standard range. Specifically, the court stated that sentencing Inda "in many ways is the most difficult because [he was] just 15 when [he] committed this crime." Moreover, as the youngest involved in the crime, the court stated that Inda's "behavior leading up to this crime is contradictory," showing independence and maturity. The court specifically recognized considerations under Houston-Sconiers, including "impetuousness" and "immaturity."

The record establishes that the trial court was presented with and considered the mitigating qualities of Inda's youth. Defense counsel reminded the court that in consideration of Inda's request for an exceptional sentence, "the Court has complete discretion is not bound by any standard range nor any mandatory penalty."[12] The judge understood it was within its sound discretion to issue a sentence below the sentencing range but explained that it did not "find it to be appropriate to give [Inda] an exceptional down[ward sentence.]" Inda has not established actual and substantial prejudice.

<u>Ineffective Assistance of Counsel</u>

Inda contends that trial counsel was ineffective because it relied on Roesch's report submitted for the decline hearing for purposes of sentencing rather than obtaining a new report. To establish ineffective assistance of counsel, a defendant must establish that his attorney's performance was deficient and that the deficiency prejudiced the

---

[12] We also note our state Supreme Court's recent decision in State v. Ellis, 5 Wn.3d 549, 560, 579 P.3d 37 (2025), held that the trial court did not meaningfully consider an 18-year-old defendant's youth when it provided alternative legal mechanisms, such as a PRP, for the defendant to seek such relief. That is unlike the present case where the trial court did consider Inda's youth but did not find it mitigating.

defendant. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (citing Strickland v. Washington, 466 U.S. 688, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Deficient performance is performance that falls "below an objective standard of reasonableness based on consideration of all the circumstances." Id. (quoting State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). To show prejudice, the defendant must prove that there is a reasonable probability that, but for the counsel's deficient performance, the outcome of the proceedings would have been different. Id. (citing State v. Leavitt, 111 Wn.2d 66, 72, 758 P.2d 982 (1988)).

There is a strong presumption that counsel's performance was reasonable. Id. (citing State v. Studd, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999)). A defendant can rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. Davis, 152 Wn.2d at 673. The defendant must show that there was no legitimate strategic or tactical reason for the counsel's action. State v. Salas, 1 Wn. App. 2d 931, 949-50, 408 P.3d 383 (2018) (citing McFarland, 127 Wn.2d at 335). We review a claim of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

During Inda's sentencing, defense counsel presented to the court Roesch's evaluation of Inda conducted prior to the decline hearing in juvenile court. Any expert report done at sentencing after trial, as Inda requests, would have presumably considered facts that were developed at trial and his post-arrest conduct. Failing to do so would have been a glaring omission. The evidence admitted at trial established that no one in the van pressured Inda to shoot Alvarez. While in custody before his decline

24

hearing, Inda received 10 program modifications for making gang related threats and signs, refusing searches or to comply with staff directives, threatening staff, refusing to do schoolwork or attend school, and fighting.

To support his argument that the court would have granted an exceptional sentence had defense counsel obtained a new report for sentencing, Inda submits an evaluation from a licensed psychologist, Dr. Marnee W. Milner, a post-conviction declaration from attorney Montes, and a mitigation report by Julie Armijo, who has a master's degree in forensic psychology. The Montes declaration only reviewed the defendant's sentencing recommendations. Armijo's report was based on Inda's self-report, review of historical documents, and information obtained from collateral witnesses. Neither Milner's evaluation, Montes' declaration, nor Armijo's mitigation report discussed Inda's behavior while in custody or addressed unfavorable facts from trial.

Moreover, as previously explained, Roesch's report and defendant's sentencing memo discussed the considerations under Houston-Sconiers that were before the court. Roesch's report included information Inda's counsel could rely on to argue the mitigating qualities of youth. It is reasonable for counsel to anticipate a new report having to take into consideration unfavorable facts established at trial and Inda's conduct while in custody, or that a report that did not consider those facts would be viewed with skepticism. It is not surprising that trial counsel tried to direct the court's attention to impressions of Inda captured in Roesch's report while explaining that counsel did so because it was closer in time to the relevant events.

After oral argument in this court, Inda filed a motion to supplement his appendix

with his declaration and a declaration from his trial counsel. The State opposed the motion but concedes that the RAPs do not expressly contemplate the timing of supplemental evidence in a PRP, and that RAP 1.2(c) and RAP 18.8(a) allow this court to "waive or alter the provisions of any of these rules in order to serve the ends of justice." We observe that Inda provides no explanation as to why he waited until after oral argument to provide his own declaration and that of his trial counsel with his petition. We also note that Inda indicated he would not object to this court allowing the State to submit additional briefing in response. We exercise our discretion and grant Inda's motion to supplement the appendix.

Inda's trial counsel admittedly chose to use Roesch's evaluation because counsel believed the evaluation "would be more accurate, because it took place closer in time to the date of the crime for which [Inda] had been convicted." Counsel did not suggest he was unaware of the court's requirement to consider Inda's mitigating qualities of youth under Houston-Sconiers. Trial counsel's declaration is consistent with what counsel represented to the trial court. The declaration affirms that the decision was a strategic choice and does not dispel our observation that Roesch's report could not have considered facts developed at trial and Inda's conduct while in custody. Such facts include no evidence that Inda was pressured by others to shoot Alvarez. See Anderson, 200 Wn.2d at 285. (juveniles must show that their immaturity, impetuosity or failure to appreciate the risks and consequences contributed to the commission of their crime).

Though Inda's appellate counsel obtained multiple expert reports addressing India's mitigating qualities of youth, the question is not whether trial counsel could have obtained a better, more thorough report. "A fair assessment of attorney performance

26

requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." State v. Grier, 171 Wn.2d 17, 40, 246 P.3d 1260 (2011) (quoting Strickland, 466 U.S. at 689).

We conclude that Inda has not met his burden to establish that trial counsel's decision not to obtain a new report for sentencing was not a legitimate tactical decision. Inda also alleges that he received a disproportionate sentence in violation of article I, section 14, but this claim assumes that the trial court would have considered and accepted a new report without question and granted a sentence below the standard range. It is under this assumption that Inda argues the imposition of a standard range sentence disproportionately punishes him because he possessed diminished culpability. We reject this argument that is built upon speculation.

Newly Discovered Evidence

Inda argues that his conviction should be vacated because Bejar's post-conviction declaration presents newly discovered evidence.

We review a claim of newly discovered evidence raised by a PRP under the same test as newly discovered evidence asserted in a motion for a new trial. In re Pers. Restraint of Fero, 190 Wn.2d 1, 15, 409 P.3d 214 (2018). Newly discovered evidence entitles a petitioner to relief if the evidence requires vacating the conviction or sentence to satisfy the "interest of justice." In re Pers. Restraint of Lui, 188 Wn.2d 525, 569, 397 P.3d 90 (2017); see also RAP 16.4(c)(3). For the exception to apply, a petitioner must show that the evidence "(1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the

exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching." Lui, 188 Wn.2d at 569. The absence of any one of the five factors is grounds to deny a new trial. In re Pers. Restraint of Brown, 143 Wn.2d 431, 453, 21 P.3d 687 (2001).

Inda presents a July 2023 declaration from his codefendant Bejar as newly discovered evidence. As a threshold matter, we reject the State's suggestion that we should follow non-binding federal authority to support its argument that such evidence cannot be newly discovered instead of an applicable published Washington case.

This court has held that a codefendant's statement, that was not available because the defendant claimed her Fifth Amendment right not to testify, could be considered newly discovered evidence when the codefendant later testified at her own separate trial. State v. Hutcheson, 62 Wn. App. 282, 297, 813 P.2d 1283 (1991). The State concedes that Hutcheson is legally applicable, but argues that this court is not bound by its reasoning and urges this court to follow "the overwhelming weight of federal precedent and refuse to consider the largely uncorroborated declaration of a former co-defendant."[13] The State cites to U.S. v. Lockett, 919 F.2d 585, 591 (9th Cir. 1990), for the proposition that when a defendant who has chosen not to testify comes forward to offer testimony exculpating a codefendant, the evidence is not "newly discovered." In Lockett, the defendant and his girlfriend, Marcella Manning, were the subjects of a cocaine trafficking investigation. Id. at 586. Lockett was eventually convicted on four counts related to conspiracy to possess and distribute cocaine. Id. at 587. At Lockett's trial, Manning appeared, "but refused to testify." Id. at 591. After his

---

[13] The State cites to cases from multiple federal circuits for a similar rule regarding ex-post-facto declarations from convicted codefendants.

conviction, Manning provided an affidavit exonerating him and stating that she would testify to that at a new trial. Id. The court held that the trial court did not abuse its discretion in denying the defendant's motion for a new trial because "a court must exercise great caution in considering evidence to be 'newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify." Id. at 592 (quoting United States v. Jacobs, 475 F.2d 270, 286 n.33 (2d Cir. 1973)).

Lockett and Manning were not codefendants in the same trial, unlike the instant case. More importantly, Hutcheson was decided after Lockett and the State concedes, Hutcheson is legally applicable and has not been overruled. We continue to follow Hutcheson, but that does not end the analysis.

In his declaration, Bejar alleges that before Inda got into the van, he heard him say that he was "lacking" while on the phone with Garcia-Garcia. Bejar interpreted this to mean that Inda was not armed. Additionally, Bejar stated that after his gun jammed, he saw a shell was stuck, picked it out, and threw it out the window. Moreover, Bejar indicated that he "was the only person in the van that shot a gun" and that nobody else shot at Alvarez. Bejar explained that he "d[id]n't know why people thought [Inda] had a gun. He may have had one when they saw him previously, but he did not have one at the time of the incident." Particularly, Bejar states "[w]hen I fired the zip gun, I had the barrel pointed out the passenger window. If someone else had pointed a gun out the window it would have been near my head and I would have heard and/or seen it. There was no other gun shot from the van."

At trial, Inda testified that, on the date of the shooting, he did not have a gun and

shared that information with Garcia-Garcia when Inda called her. However, Estrada-Bautista testified that, on the morning of the shooting, Inda told him that he had a revolver and showed it to him. Additionally, Estrada-Bautista saw Inda holding a revolver outside of the passenger window of Garcia-Garcia's van during the shooting. He also stated that he saw Inda move from a seated position to "somewhat" standing up with a resolver in his hand. Soon after Bejar said his gun jammed, Estrada-Bautista said he "kept hearing like two or three shots more" and that there was no break between shots.

At trial, witness Matthew Shaw testified that he was driving behind Garcia-Garcia's van at the time of the shooting. As he was driving behind the van, he stated that "it sounded like two shots or firecrackers, or whatever, and then after that, you could see what looked like a gun stick out of the van, and then there was like three more shots." Shaw specifically indicated that it appeared that a revolver was coming out of the passenger's side window. Shaw also said that he could see the direction of silhouettes moving within the vehicle and "[i]t looked like [silhouettes were moving] from the passenger side back to the center." After the shooting, Estrada-Bautista saw Inda put his jacket over his fingers before taking out the shells from his revolver. It is unknown what Inda did with the shells after that. A single shell casing was discovered from the scene. Detective Richard Adams testified that revolvers keep shell casings in them when they are fired but semiautomatic weapons eject shell casings when fired.

Ultimately, the jury convicted Inda of unlawful possession of a firearm, meaning that the jury rejected Inda's claim that he did not have a gun, and found Estrada-Bautista's testimony credible. That evidence would not change because of Bejar's new

testimony. The State also points out that Bejar's crimes of dishonesty would also likely be admissible for the jury's consideration of his credibility.

Moreover, this court has held:

> Where…the state has produced strong the convincing evidence of guilt and the defendant little or no evidence of innocence, a new trial should not be granted on the unsupported, uncorroborated testimony of an accomplice or codefendant, nor upon the offer of any new evidence unless it appears that the newly discovered evidence is of such significance and cogency that it will probably change the result of the trial.

State v. Peele, 67 Wn.2d 724, 732, 409 P.2d 663 (1966). In the instant case, the State produced strong, convincing evidence of guilt through Estrada-Bautista, Shaw, and Adams's testimonies. The only testimony that supports Bejar's declaration is Inda, which the jury did not find credible. Inda does not meet his burden to establish that Bejar's declaration would probably change the result of trial.[14] Thus, Inda has not established a basis to reverse his conviction and remand for a new trial.

## CONCLUSION

We deny the PRP.

_____
Coburn, J.

WE CONCUR:

_____, ACJ

_____

---

[14] Because we hold that Inda is not entitled to relief, we need not address Inda's unique argument that Bejar overhearing Inda state that he was "lacking" would be admissible as a present sense impression or statement of then-existing mental and physical condition.